671 So.2d 581 (1995)
Alan Dale WALKER
v.
STATE of Mississippi.
No. 92-DP-00568-SCT.
Supreme Court of Mississippi. En Banc.
October 12, 1995.
Rehearing Denied April 18, 1996.
*587 Robin E. Midcalf, Gulfport, Carmen G. Castilla, Lowery & Castilla, Jackson, for Appellant.
Michael C. Moore, Attorney General, Jackson, Marvin L. White, Jr., Assistant Attorney General, Jackson, Jeffrey A. Klingfuss, Sp. Ass't Attorney General, Jackson, for Appellee.
Before HAWKINS, C.J., PRATHER and DAN M. LEE, P.JJ., and SMITH, SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and McRAE, JJ.
SMITH, Justice, for the Court:
Today we are confronted with the senseless slaying of Konya Rebecca Edwards, a young teenager who fought back against her assailants and at other times cooperated in a vain attempt to avoid being killed, to which the jury responded by sentencing Alan Dale Walker to death.
Walker, appeals to this Court his conviction of capital murder during the commission of sexual battery. Walker was indicted by the Grand Jury of Harrison County, Mississippi, during the March 1991 term for capital murder, rape and kidnapping of Edwards. Walker received a change of venue and was tried in Warren County, where a jury found him guilty as charged and sentenced him to death on the capital murder count. Walker was also convicted of the rape and kidnapping and received additional sentences by the trial judge of thirty and thirty-five years to run consecutively.
Aggrieved, Walker argues twenty-two issues for reversal. However many of the issues were not initially raised in the lower court or brought to the court's attention by appropriate timely objection. This Court has repeatedly held that "[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).
This Court, after finding a procedural bar, need not look further. However, the Court alternatively, may review the merits of the underlying claim knowing that any subsequent review will stand on the bar alone. *588 The Fifth Circuit Court of Appeals has addressed this issue in Sawyers v. Collins, 986 F.2d 1493, 1499 (5th Cir.1993), stating:
On application for the writ of habeas corpus, federal courts will not review a state court's holding on a federal law claim ... if that holding rests upon a state law ground which is both independent of the merit of the federal claim and adequate to support the state court's judgment. Harris v. Reed, 489 U.S. 255, 260-63, 109 S.Ct. 1038, 1042-43, 103 L.Ed.2d 308 (1989).
Consequently, "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." Ylst v. Nunnemaker, 501 U.S. 797, 800, 111 S.Ct. 2590, 2593, 115 L.Ed.2d. 706 (1991) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977); Murray v. Carrier, 477 U.S. 478, 485-92, 106 S.Ct. 2639, 2643-48, 91 L.Ed.2d 397 (1986)).
Furthermore, where a state court finds that a federal claim is procedurally barred, but goes on to reach the merits of that claim in the alternative, the state court's reliance on the procedural default still constitutes an independent and adequate state ground which bars federal habeas review. The United States Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) stated:
The mere existence of a basis for a state procedural bar does not deprive this Court of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case... . If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision... . An examination of the decision below reveals that is contains no clear or express indication that separate, adequate, and independent state-law grounds were the basis for the court's judgment ...
472 U.S. at 327, 105 S.Ct. at 2638-39.
This Court's most recent pronouncements on this issue are found in Foster v. State, 639 So.2d 1263 (Miss. 1994), reh'g denied, (Miss. Aug. 18, 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1365, 131 L.Ed.2d 221 (1995), and Chase v. State, 645 So.2d 829 (Miss. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2279, 132 L.Ed.2d 282 (1995).
The issues which were not properly raised in the trial court are procedurally barred from consideration by this Court. There are only two or three issues raised by Walker which concern this Court. We have thoroughly considered these as well as all remaining issues and found them to be without merit. This Court finds that Walker received a fair trial and therefore affirms Walker's conviction and sentence of death.

STATEMENT OF THE FACTS
On September 8, 1990, Konya Rebecca Edwards, nineteen years old, returned home after her Saturday afternoon shift at the East China Restaurant in Long Beach, Mississippi. Edwards lived in a duplex she shared with her mother and grandmother. Edwards left the house that night to go out with her aunt, Maggie Thomas, and Maggie's boyfriend. When Edwards did not return home or call, as she customarily did, her family began to worry. At 5:30 p.m., on Sunday, the Long Beach Police Department was contacted. Edwards' wallet, found at the scene of the crime, was returned to her family by a family friend who worked at the docks in Gulfport. Edwards' grandmother, Tillie Edwards, accompanied by her daughter and her daughter's boyfriend, went to the area where the friend had reported finding the wallet and began to search for Edwards. Tillie located Edwards' body and the police were promptly called. Tillie later identified the black dress recovered from Walker's house as the dress Edwards was wearing on the night in question.
The following facts are a brief sketch taken from the testimony and statement of Jason William Riser. Riser, testified that he was with Walker at the Fiesta Club between 7:30 and 8:00 p.m. on September 8, 1990. They were met at the club by Trina Perry, Walker's girlfriend. Sometime between 9:00 and 10:00 p.m., Riser and Walker met Konya Edwards for the first time. Edwards was *589 upset because someone had stolen her purse. However, Riser observed Edwards still had her wallet and had placed it in the top of her dress. Riser identified the black dress recovered from Walker's house as being the dress worn by Edwards on the night of September 8, 1990. Later that night, Riser, Walker, Perry and Edwards left the Fiesta. Perry drove with Walker in her vehicle and Riser and Edwards followed in Riser's truck. Riser had agreed to take Edwards home. On Turner Road, Walker told Perry to stop her car so he could show Riser and Edwards a place they could "be together." Edwards had passed out. Riser also stated that Edwards was intoxicated. Walker suggested they drive to Crystal Lake. Walker told Perry to wait down the road for them and he would meet her later.
At the lake, Walker "got out of the truck and said we was gonna rape this girl." Walker returned to the truck and began "messing" with Edwards, grabbing her legs and breasts, fondling Edwards. Edwards woke up and became loud in her resistance to Walker's fondling. Walker hit her in the face several times. Walker "asked her if she wanted to live or die." Walker grabbed Edwards by the arm and pulled her out of the truck. He placed his hand over her mouth several times to keep her quiet. Walker told Edwards to cooperate and everything would be all right. The three walked toward the sandy path which encircled the lake. Whenever Edwards resisted physically or vocally, Walker would hit her and repeatedly say "live or die." Walker instructed Edwards to take off all her clothes, which she did hesitantly. Walker grabbed her by the arm again and walked her by the side of the lake in the woods. Walker struck her again in the face and told her to lie down on the ground. Walker knelt beside Edwards and attempted to rape her. Riser could not tell if Walker was successful, but thought that Walker was unable to have intercourse. Walker then stood back up telling Riser he "couldn't do anything with her right now," and told Riser to take his turn. Riser raped Edwards by vaginal intercourse. Walker approached Edwards and struck her in the face with his fist while she was still lying down. Walker told Edwards to perform oral sex on Riser while Walker had anal sex with her. Edwards said she couldn't do that, but Walker pushed her head down toward him and forced her to perform oral sex. She then bit Walker's penis. He hit her again in the face with his fist and shook her, telling her she had better cooperate so she wouldn't get hurt. In his statement, Riser maintained that both he and Walker had anal intercourse with Edwards.
Walker nudged Edwards toward Riser, who pushed her down and she began to perform oral sex. When Walker attempted anal sex, Edwards told him she couldn't and turned around and slapped him. The two struggled and Walker began choking Edwards. Riser stood watching. Walker fell to the ground, still choking Edwards, then suddenly came to his feet, letting Edwards fall, coughing and "hanging onto her throat." Walker told Riser he would have to kill Edwards.
Walker asked her if she wanted to live or die; Edwards said she wanted to live. All three walked into the lake. They then returned to the earlier location, where Walker, holding Edwards by the arm, struggled with Edwards and hit her. Walker and Riser dressed, each one holding onto Edwards while the other dressed. Walker instructed Edwards to lay flat on her stomach and put her chin on a nearby log. He felt the log to check its placement, and said, "all right." Walker looked down at Edwards then "stomped on the back of her neck," seven or eight times. Edwards rolled over, bleeding, and ran to Riser, saying, "help me, Jason, help me, don't let him do this no more." Edwards kept repeating to Walker, "What did I do to you." Edwards was crying and told Walker, "I didn't do nothing to you." Walker told Edwards, "unless you be quiet we're gonna have to kill you." Edwards responded, "Well go ahead and get it over with." Walker then pulled her towards him and told her that was enough, that they would take her down to the water, clean her off and let her go. Walker told Riser to hold Edwards by the arm so she wouldn't run off. Riser stated that she was not free to leave. All three walked to the water again, Walker telling Edwards that they were going to get cleaned up and have a little sex.
Walker stopped, undressed again, and continued into the water with Edwards, telling *590 her to turn around, then began choking her and pushing her head beneath the water. A lot of splashing was going on, with Edwards occasionally surfacing and struggling for about 10 minutes. Eventually, the splashing stopped.
Walker told Riser to go pull Edwards' body out of the lake. Riser pulled Edwards' arm and she jerked and made a sound. Walker looked at her and said, "Naw, she ain't dead yet," and flipped her face back into the water. The two then carried her away from the lake. Walker commented, "dead weight sure is heavy." They put Edwards down, then Walker looked around, picked up a stick, and inserted it into Konya's vagina, declaring he had "always wanted to do that." Walker decided Edwards would have to be burned. With nothing to start a fire, Walker and Riser left to get gasoline in a can; Walker telling Riser on the way he would get killed if he ever told anyone about the night's events. They parked the truck in the driveway of a friend who was not home and waited until they saw no one around before exiting the truck to get the gas can. They returned to the scene on foot poured the gasoline on Edwards and with some difficulty, finally ignited her body. They ran from the woods, jumped into the truck and returned to Walker's home to find Trina Perry and Walker's mother waiting there. Walker hid Edwards' dress behind his house trailer and later Riser and Walker took the dress inside the trailer. The gas can was placed "under the guys house we knew." Around 2:00 a.m. Perry asked if Walker took Edwards home. Walker replied, "No, she started kicking  or something around and she wanted out; so he said, I let the bitch out on Klondike and 28th Street." The group stayed up talking and taking Polaroid snapshots. As Riser put it, he and Walker, some 45 minutes after the killing of Edwards, were "acting like nothing had happened."
Walker stated that they had seen a fire on 28th Street and asked Perry if she wanted to go see it. The group drove past the location of the fire, but did not stop at the exact location of the body where the woods were on fire. Shortly thereafter, the group was stopped by Deputy Sheriff Wheeler for weaving on the road.
Two days later, Perry saw Edwards' picture in the newspaper. Perry was en route to pick up Walker from his workplace that afternoon, but on the way, stopped, turned around and headed to the Long Beach police station. Perry stated she knew then that Edwards "had gotten killed that night that she was with us...." Later, speaking to Walker by telephone when he was in jail, Perry asked how he could do something like that. Walker told Perry he didn't know, "something just snapped." In a face to face conversation at the jail, Perry asked Walker, "Did you really kill her?" Walker replied, "Yes."
Dr. Paul McGarry, a forensic pathologist, testified he examined the body of Konya Edwards three days after the murder, on September 11, 1990. The body was badly burned. Most of the skin and all the external fibers were burned. Internal examination revealed the lungs were filled with a bloody fluid, as were the bronchial tubes. There were hemorrhages to the skull, behind the eyes and at the base, and extensive bruising of all the tissues over the head. These injuries were caused by a blunt, beating type of force, while the victim was still alive. The bone in the neck was fractured. This type of injury occurs in a violent, strangulation maneuver of the throat. As opposed to a blow to the neck, this injury is caused by hard pressure, such as squeezing with a hand or other object against the throat. The pelvic organs indicated a deep, scraping mark and a partially burned stick still inserted in the vagina. The doctor stated the stick was "fresh," burned on the outside, but not on the inside and was "probably" placed there after the victim's death or "close in time" to her death.
Dr. McGarry opined that death was the result of the injuries to Edwards' face and neck, which constricted her airways and left her unable to breath. In addition to being unable to breathe, the appearance of lungs full of fluid was consistent with a drowning.
Tonya Killgo, a friend of Edwards, testified that the black dress found at Walker's mobile home was the same dress that she owned. Killgo had loaned the dress to Edwards some time prior to this incident.
*591 The jury retired to deliberate at 4:37 p.m. and returned with a verdict at 5:58 p.m., finding Walker guilty on all counts.
At the sentencing phase, the State readopted the evidence introduced during the guilt phase and offered the testimony of officer Robert Burriss. A single photograph of Edwards' burned body, taken by Burriss was allowed into evidence. Burriss testified that the photo accurately portrayed the body at the crime scene. Two areas of Edwards' body were the most severely burned. Burriss testified that Edwards' fingers were burned off to the second joint, prohibiting fingerprints from being taken. Additionally, the pubic area of Edwards' body was severely burned, preventing officers from obtaining pubic combings from which comparison analysis could be performed.
Walker presented mitigating evidence from several family members and his supervisor from Tilley Construction Company where he was employed. The consensus of their testimony was that Walker was a good employee, liked by his peers and that he took good care of his sixteen month old daughter. He had instructed his mother to give his entire 1990 income tax refund to his child. The jury heard evidence of Walker's receipt of a certificate of appreciation from the City of Biloxi for rescuing a baby from a burning home. Walker's mother stated that Walker and Riser should have been treated the same. The jury in due course found Walker should suffer the death penalty.
The Circuit Court thereupon sentenced Walker to death by lethal injection. Miss. Code Ann. § 99-19-51(1) (Supp. 1987). This appeal followed.

DISCUSSION

I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT WALKER'S MOTION FOR CONTINUANCE WHEN THE STATE ANNOUNCED TWO DAYS BEFORE TRIAL THAT THE CODEFENDANT WOULD TESTIFY FOR THE STATE AFTER REPEATED ASSERTIONS THAT HE WOULD NOT?
Walker's trial was set for August 5, 1991. On August 3, 1991, the State advised defense counsel that Jason Riser had accepted a plea bargain and would in return testify against Walker. The defense requested a continuance so that they might "more adequately prepare for his testimony," and alternatively, requested Riser be precluded from testifying. The trial court denied the motion commenting "under different circumstances the Court would probably feel that with the announcement that a witness of this importance was going to testify only two days before the trial, that it might make a difference in granting a continuance."
The court noted, however, that Riser and Walker had both been arraigned in June of 1991, and further observed:
[A]nd with the statement of counsel that he received the transcribed statement of Mr. Riser on the day of arraignment, which is the ordinary procedure for discovery to be presented at the date of arraignment, that is a substantial period of time that counsel has had the testimony of Riser, because I would make also this observation ... I did review the video recording of that statement, which if I recall correctly consumed close to between 55 minutes and one hour and was in detail, which is an unusual circumstance as far as the information that a witness is to present.
That being given, even though it's not necessary that counsel would in every event expect that there would be a sudden change from that of the defendant to a cooperating witness, I still feel that that was probably something that was considered from the very beginning, that either one of the defendants could very well change their position if offered an opportunity to do so.
Notwithstanding the trial court's stated reasons for denying the continuance, Walker insists that the denial severely prejudiced his case. He asserts with the news of Riser's impending testimony that "overnight the case changed from a case of weak circumstantial evidence ... to a case with detailed eyewitness testimony from an accomplice."
This issue is procedurally barred since on appeal Walker for the first time argues he *592 needed time to investigate Riser to find information to impeach him, to reveal inconsistencies in his story, and to study his alleged limited mental capacity. Walker failed to present such argument at trial; thus he is procedurally barred from review on this issue. Chase v. State, 645 So.2d at 835 (Miss. 1994); Foster v. State, 639 So.2d at 1289 (Miss. 1994).
Without relaxing the bar, this Court also looks to the underlying merits of the claim. This Court has often stated that the decision whether to grant or deny a continuance is a matter left to the sound discretion of the trial court. Unless manifest injustice is evident from the denial of a continuance, this Court will not reverse. Johnson v. State, 631 So.2d 185, 189 (Miss. 1994), citing Wallace v. State, 607 So.2d 1184, 1190 (Miss. 1992); Morris v. State, 595 So.2d 840, 844 (Miss. 1991); Fisher v. State, 532 So.2d 992, 998 (Miss. 1988).
Further, this Court has stated that "the denial of a continuance in the trial court is not reviewable unless the party whose motion for continuance was denied makes a motion for a new trial on this ground." Metcalf v. State, 629 So.2d 558, 562 (Miss. 1993). Like Metcalf, Walker's motion for a new trial raised only questions on the weight of the evidence, challenges to "each overruled motion and objection by the defense," and "such other causes as will be provided... ." Id. at 561-62.
Walker attempts to align his situation with that presented in Traylor v. State, 582 So.2d 1003 (Miss. 1991). Traylor, charged with burglary, was faced with the State calling as its first witness the only eyewitness to the crime. Only two days before trial the State informed Traylor the witness would testify, and one day later his statement was furnished to the defense despite a request made months earlier. Id. at 1007. The court allowed defense counsel at trial fifteen minutes to interview the witness, but denied additional time to "follow through on the results." Id. at 1006.
In considering whether the denial of the continuance was error, this Court has stated that "the question of whether defendant had a reasonable opportunity to prepare to confront the State's evidence at trial depends upon the particular facts and circumstances of each case." Id., citing Reuben v. State, 517 So.2d 1383 (Miss. 1987).
In the case at bar, the facts do not support that Walker was denied a "reasonable opportunity to prepare." The trial court noted that discovery including Riser's statement was supplied to Walker in June of 1991, two months before trial was set to begin. Second, although defense counsel requested to speak with him when it was learned he would testify, Riser through counsel declined. Thus, no additional time was necessary for this purpose.
In Morris v. State, 595 So.2d 840 (Miss. 1991), this Court found no error in the denial of a continuance where discovery was provided to the defense two days before trial, although counsel was orally informed of the identity and location of State's witnesses the previous week. Id. at 843. The Court found Morris made "no showing that he would have been better able to meet the prosecution's evidence given more time. Even a wrongful denial of continuance, which is not present here, does not mandate reversal absent a showing of injury." Id. at 844. The Court concluded:
Nothing is presented in this appeal which indicates the defense would have been handled any differently had the continuance been granted; therefore, even assuming for argument's sake the denial was not proper, the appellant has failed to show that he did not receive a fair trial.
Id.
Returning to the case sub judice, Walker also contends that the procedure for the court's response to a discovery violation, set forth in Box v. State, 437 So.2d 19 (Miss. 1983), applies. Box is inapplicable to Walkers case since there is no assertion that the State withheld the fact of Riser's plea bargain or discovery materials. ("The State advised defense counsel on [August 3] before the trial started on [August 5] that Riser would testify." Walker admits in his brief that, "Presumably, the State gave notice immediately after the deal was struck with *593 Riser.") Again, the State had already furnished Riser's videotaped interview and transcribed statement to Walker two months earlier at arraignment.
Finally, Walker argues that the "last minute decision" to call Riser made effective cross-examination of Riser impossible. This argument is also unsupported by the extensive cross-examination of Riser conducted by Walker's counsel. Defense counsel's examination of Riser consumed well over 100 pages of the trial record; the State reports questioning lasted over 4 hours. Walker fails to show how he was prejudiced. How can Walker claim impairment of a defense never presented? Indeed, Walker called no witnesses of his own during the guilt phase, but relied on a lengthy and thorough cross-examination of the State's witnesses in his attempt to place the blame for the crime on Riser in order to cast reasonable doubt of his own guilt. Counsel's cross-examination does not indicate that he was unprepared.
Under the facts presented: where no discovery violation occurred; where the defense was afforded two days to review the fifty-five minute videotape and accompanying typed transcript of Riser's statement (provided two months before trial); where extensive cross-examination was conducted, and where there is no indication the case would have been handled differently had more time been allowed, the denial of a continuance was not error.
This assignment of error is procedurally barred and, alternatively, without merit.

II. WHETHER THE EVIDENCE BEFORE THE JURY ON THE UNDERLYING FELONY OF SEXUAL BATTERY WAS LEGALLY INSUFFICIENT TO SUPPORT A VERDICT OF CAPITAL MURDER?
Walker contends that the evidence of the underlying felony is insufficient because the sexual battery took place only as an "after-thought." Walker argues: "In this case the problem is not that the killing occurred before the sexual battery; the problem is the lack of intent to commit sexual battery before the killing. If the intent to perform sexual battery was not formed until after the killing, the killing could not have been done in the course of sexual battery."
The State responds that the numerous references to the forced sexual acts spread over a two hour time period make Walker's intent to commit sexual battery upon Edwards "abundantly clear." Walker's intent, the State maintains, culminated in the insertion of the stick into Edwards, arguably just after her death. The State concludes that the evidence, combined with Walker's clear expression of his desire to commit this type of sexual battery, is legally sufficient to support the underlying offense.
Count 1 of the indictment charged that Walker did kill and murder Edwards while in the commission of the crime of sexual battery. Instruction S-1 informed the jury that the offense of Capital Murder consisted of the following elements:
1. The incident in this case occurred on or about September 9, 1990, in the First Judicial district of Harrison County, Mississippi;
2. Konya Rebecca Edwards was a living human being;
3. The Defendant, alone or in conjunction with another, did wilfully, unlawfully and feloniously kill and murder Konya Rebecca Edwards by asphyxiation, said asphyxiation resulted in the death of Konya Rebecca Edwards; and
4. That the killing of Konya Rebecca Edwards occurred while the Defendant, alone or in conjunction with another, was in the process of committing the crime and felony of Sexual Battery of Konya Rebecca Edwards, against her will... .
The jury was further instructed on the sexual battery by Instruction S-12A, which read:
The Court instructs the jury that for the purposes of this trial Sexual Battery means the penetration of the vaginal opening of the body of Konya Rebecca Edwards by the use of a limb or stick by Alan Dale Walker alone or in conjunction with Jason Riser, when Konya Rebecca Edwards was dead or alive.
*594 The State relied upon the definition of sexual battery contained in Miss. Code Ann. § 97-3-95 (Supp. 1980), which provides:
(1) A person is guilty of sexual battery if he or she engages in sexual penetration with:
(a) Another person without his or her consent.
Section 97-3-97, defining "sexual battery," makes clear that sexual penetration includes "any penetration of the genital or anal openings of another person's body by any ... insertion of any object into the genital or anal openings of another person's body," thereby encompassing the crime with which Walker was charged.
This Court has stated that "a valid Section 97-3-19(2)(e) capital murder conviction must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony had either been charged alone". Fisher v. State, 481 So.2d 203, 212 (Miss. 1985) (emphasis added). See also, Moore v. State, 344 So.2d 731, 735 (Miss. 1977).
The jury was presented with evidence that a sexual battery was performed upon Edwards by the insertion of a stick into her vagina. The pathologist testified that the portion of the stick protruding from the victim was charred by the fire, while that part remaining inside the body was not. The eyewitness account of Jason Riser was that in carrying Edwards' body from the bank of Crystal Lake towards the woods, Walker stopped abruptly, looked around on the ground, picked up the stick and inserted it into Edwards. According to Riser, Walker declared "he had always wanted to do that." There is no question that the sexual battery took place, since the stick was still inside Edwards when the autopsy was performed.
In West v. State, 553 So.2d 8 (Miss. 1989), the defendant attempted to prove that he shot and mortally wounded his victim, then sexually assaulted her. On such facts, he argued, he could not have committed the underlying offense since the statute requires non-consensual sexual penetration with another person, a corpse not qualifying as a person.
This Court rejected West's argument, stating:
Mississippi law accepts a "one continuous transaction" rationale in capital cases. In Pickle v. State, 345 So.2d 623 (Miss. 1977), we construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached... ." 345 So.2d at 626; (further cites omitted). There is certainly evidence in this record from which the jury could have found Brim alive when West's assault reached this point. An indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." Id., Neal v. State, 451 So.2d 743, 757-58 (Miss. 1984); Pruett v. State, 431 So.2d 1101, 1104-05 (Miss. 1983). The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge.

Id. at 13 (emphasis added).
Fisher v. State offers further guidance on the issue of intent to commit an underlying offense sufficient to support a capital murder conviction. Fisher was convicted of the crime of capital murder in the commission of rape and robbery. On the rape felony, recent sexual contact by the victim with a male was established as well as the fact of death. This Court summarized the proof:
This [evidence], coupled with the evidence that Fisher had never known Melinda before and the fact that she was found strangled to death several days later, establishes to any reasonable mind that anything done to Melinda on the night of May 4, 1983, was done against her will by the use of force or by threatening her with personal injury. The evidence shows that one of the things that happened to Melinda on that night was sexual intercourse with a male.
Absent a confession, intent necessarily must be established by circumstantial evidence. Voyles v. State, 362 So.2d 1236, *595 1242-43 (Miss. 1978). It is both common sense and common law that a man be held to have intended that which he did. Here the evidence ... is such that reasonable jurors could well have found beyond a reasonable doubt ... that on the evening of May 4, 1983, Melinda Gail Weather was raped, that the person who committed the rape was Larry Fisher, that Fisher acted with felonious intent, and that the rape occurred in substantial temporal and factual relation to her murder at the hands of Larry Fisher.
Id. at 213 (emphasis added).
Finally, in Wheat v. State, 420 So.2d 229 (Miss. 1982), the Court considered the appellant's contention that the evidence was insufficient to prove his intent to commit the robbery underlying the capital murder charge. Id. at 238. One victim was found with his hands and feet tied, a bullet to the back of the head; and in due course, the appellant was found in possession of the victim's car and personal possessions. Id. at 239. The often troublesome task of determining a person's intent was discussed:
This Court said in Shanklin v. State, 290 So.2d 625 (Miss. 1974):
Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.

Id. at 627 (emphasis added).
The Court further said in Thompson v. State, 258 So.2d 448 (Miss. 1972), the following:
Unless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident.
Thompson, 420 So.2d at 239.
Returning to the case at bar. Walker's contention that he did not form the intent to commit the act until after Edwards' death is not supported by the series of acts penetrated over an approximate two hour period immediately prior to the killing. The evidence showed that Walker suggested going to Crystal Lake so that Riser and Edwards could "be together," despite the fact that Edwards was already passed out at the time. There were various attempts by Walker to force Edwards to have intercourse and oral sex with himself and Riser. In his statement Riser claimed that he and Walker had anal intercourse with Edwards. Finally, after all these forced sexual acts, some of which also constitute sexual battery, the sexual battery of inserting the stick into Edwards' vagina, and the killing of Edwards took place. Fully considering the surrounding circumstances of Edwards' murder, Walker was unsuccessful for obvious reasons in convincing the jury that he formed the intent to commit the sexual battery only after killing Edwards.
As in West, the jury may not have been convinced that Edwards was dead at the time of the sexual battery. That she was still clinging to life could be inferred by the jury from the fact that after Walker's attempts to drown her, and believing she was dead, he pulled Edwards' body to the edge of the water. Upon instructions from Walker, Riser, checking to see if she was in fact, dead, discovered she was not. Although Walker placed Edwards' face back into the water, it was only moments thereafter that Edwards was carried into the woods and the sexual battery was committed. Whether or not there was any life left in Edwards at that point cannot be determined.
Despite the possibility that the actual moment of Edwards' death may have possibly occurred immediately prior to the sexual battery, the evidence sufficiently established Walker's intent to commit the offense. Next to a confession, his actions and the statement attributed to Walker that he had "always wanted to do that," referring to the sexual battery, was the best evidence of Walker's intentions that night. As in Voyles, we hold that Walker "intended that which he did." Walker's expressions, coupled with the surrounding circumstances of the incident and the act of placing the stick in Edward's vagina, clearly and sufficiently illustrated to the jury Walker's intention of committing a sexual battery upon Edwards. There was sufficient *596 evidence of Walker's felonious intent and that the sexual battery occurred in substantial temporal and factual relation to Edwards murder to support the capital murder conviction.
This issue is without merit.

III. WHETHER JURY INSTRUCTION S-14 AT THE GUILT-INNOCENCE PHASE, IN CONJUNCTION WITH THE STATE'S OTHER INSTRUCTIONS ON CAPITAL MURDER AND SEXUAL BATTERY, RELIEVED THE STATE OF THE BURDEN OF PROVING INTENT TO COMMIT THE UNDERLYING FELONY, THEREBY VIOLATING THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT?
Walker continues his discussion of sexual battery, here focusing on the giving of Instruction S-14 which read:
The fact that the actual moment of the victim's death may have preceded alleged consummation of the underlying felony of Sexual Battery does not void the charge of Capital Murder.
Walker contends S-14 misled the jury on the intent necessary for the capital murder conviction, as it "could only be a correct statement of the law if the jury also found that Walker had formed the intent to commit sexual battery."
This Court has stated that when considering a challenge against a jury instruction, the instructions are read and considered as a whole. Roundtree v. State, 568 So.2d 1173, 1177 (Miss. 1990). "This same logic is reflected in the holding of this Court that instructions should be read in their entirety to determine if there was error." Chase v. State, 645 So.2d at 852 (Miss. 1994), citing Anderson v. State, 381 So.2d 1019, 1024 (Miss. 1980).
Other instructions explained in more detail the burden of proof. Instruction S-1, supra, instructed the jury that it must find Walker "wilfully, unlawfully and feloniously" did kill Edwards and that the killing occurred "while the Defendant, ... was in the process of committing the crime and felony of Sexual Battery... ." Instruction S-4 defined for the jury the word "wilful" as meaning "nothing more than intentionally doing an act."
When S-14 is read in conjunction with the other instructions, the jury was clearly informed that it must find that Walker intended to kill Edwards while engaged in the commission of sexual battery.
This issue is without merit.

IV. WHETHER THE TRIAL COURT ERRED IN NOT FULLY INSTRUCTING THE JURY ON THE CRIME OF MANSLAUGHTER; FURTHERMORE, THE OVERLAP BETWEEN CAPITAL MURDER AND FELONY-MANSLAUGHTER UNDER MISSISSIPPI STATUTORY LAW VIOLATES THE EIGHTH AMENDMENT?
Walker failed to object, thus his claim is procedurally barred. Walker also waived this claim because he failed to offer any lesser included offense instruction of his own, either murder or manslaughter, for the trial court's consideration. Without relaxing the bar, this Court also alternatively looks to the merits of Walker's claim.
Instruction S-2 set forth the elements of the lesser offenses of both Murder and Manslaughter in the event that the jury did not find the State proved every element of Capital Murder. S-2 instructed the jury, in relevant part:
Manslaughter is the killing of a human being, without malice, in the heat of passion, without authority of law, and not in necessary self-defense.
If you find from the evidence in this case beyond a reasonable doubt that Konya Rebecca Edwards was a human being and that the Defendant, ALAN DALE WALKER, did wilfully, unlawfully and feloniously kill and slay Konya Rebecca Edwards, without malice, in the heat of passion, without authority of law, not in necessary self-defense, and under the bona fide belief, but without a reasonable cause therefor, *597 that it was necessary for him, ... to do so in order to prevent the infliction of death or great bodily harm to himself or another; then the Defendant is guilty of Manslaughter.
Walker contends he was entitled to an additional, separate culpable negligence manslaughter instruction defined in § 97-3-27. That section provides:
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.
Walker argues an identical issue to one successfully raised in Butler v. State, 608 So.2d 314 (Miss. 1992). Walker's attempt to liken his situation with that presented in Butler fails for several reasons. First, unlike Butler, Walker did not offer any instruction on any lesser offense, either murder or manslaughter. Butler was convicted of capital murder while in the commission of felonious child abuse. Miss. Code Ann. § 97-3-19 (Supp. 1991) provides a killing is capital murder when done with or without the intent to effect death while a person is engaged in such child abuse (emphasis added). Butler specifically requested a manslaughter instruction under § 97-3-27 which provides that a killing done during the commission of a felony other than those specifically excepted, shall be manslaughter, punishable by a maximum sentence of twenty years imprisonment. See also § 97-3-25 (1972).
The requested manslaughter instruction was refused, although the State agreed to a heat of passion manslaughter instruction instead. Id. at 319. Although this court reversed on other grounds, it commented:
It is well established that where there are two separate criminal statutes for the same offense, the State has a choice of deciding the statute under which to prosecute. It is also settled that in such cases the accused is not entitled to have the jury instructed on the statute carrying the lesser penalty. Identical offenses do not authorize lesser included offense instructions. We do not depart from these principles in the general run of criminal prosecutions.
In this case, however, we have a defendant who, under the capital murder statute, was sentenced to death when there was another criminal statute for the same offense with the maximum penalty of twenty years imprisonment. Compare Miss. Code Ann. §§ 97-3-25 (1972), 97-3-21 (Supp. 1991).
We conclude that Butler was entitled to have the jury instructed that she could be convicted under Miss. Code Ann. § 97-3-27, the manslaughter statute.
Id. at 320 (citations omitted).
"This Court has repeatedly held that `[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case.'" Foster v. State, 639 So.2d at 1270 and cases cited therein.
The following exchange took place during deliberations on Instruction S-2, which instructed on Capital Murder, Murder and Manslaughter:
THE COURT: All right; then we go to S-2, and this is the one that basically recited what the Court's C-20 was, and that is that 
MR. CARANNA (Prosecution): May I see the Court's?
THE COURT: All that mine did was just the lesser included language that you have in the preface to this one. I prefer to go with the State's S-2 as opposed to  what does the defendant say as to S-2?
MR. STEGALL (Defense): The defendant has no objection.

THE COURT: No objection?

MR. STEGALL: No.

THE COURT: S-2 will be given, and so that means that my C-20 is removed.
Like Walker's failure to object to S-2, his failure to offer a manslaughter instruction of his own waives his ability now to challenge the one given. In addition to the procedural bar to this issue, the evidence does not indicate support for a manslaughter instruction under § 93-3-27. "Of course, lesser offense *598 instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record." Chase v. State, 645 So.2d at 851, citing Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985); Lee v. State, 469 So.2d 1225, 1230 (Miss. 1985).
Again examining the Butler Court's discussion of § 93-3-27, it was stated: "This statute authorizes a conviction of manslaughter for a killing in the course of the commission of a crime, `except rape, burglary, arson or robbery,' even though there was no intent to kill." 608 So.2d at 319. There is not a shred of testimony or other evidence which might allow a reasonable juror to find beyond a reasonable doubt that Walker did not intend to kill Konya Edwards.
Berry v. State, 575 So.2d 1 (Miss. 1990), provides a useful analysis of a similar argument raised by the appellant, convicted of capital murder in the commission of a kidnaping. Berry, too, argued he should be granted a § 93-3-27 manslaughter instruction to be applied if the jury failed to find him guilty of the underlying offense and also found he had killed his victim without premeditation. Id. at 11. The Court noted:
While Berry's statement indicates that he did not intentionally set out to murder Mary Bounds, the manner in which Mary Bounds was killed must be examined. We must determine whether  taking the evidence in the light most favorable to the accused, and considering all reasonable inferences which may be drawn in favor of the accused from the evidence  a hypothetical reasonable jury could convict him of manslaughter. The crime of manslaughter is defined as a killing without malice. Malice has been defined as:
The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice... . Malice is implied, and hence murder exists, whenever a death occurs as a result of some willful act by the accused under circumstances where he knows the act is likely to cause death or serious bodily injury.
Berry, 575 So.2d at 12, citing Garrett v. State, 749 S.W.2d 784, 789, n. 7 (Tex. Crim. App. 1986).
Considering the pathologist's expert testimony that Berry's victim died from blunt trauma to the head, i.e., she was beaten to death, the Court determined "no reasonable juror could find that this killing was without malice and Berry was not entitled to the lesser included offense of manslaughter." 575 So.2d at 12. See also, Wilson v. State, 574 So.2d 1324 (Miss. 1990); Mackbee v. State, 575 So.2d 16 (Miss. 1990); Holland v. State, 587 So.2d 848 (Miss. 1991).
Returning to the case at bar, Walker's victim, Edwards, was ultimately killed by asphyxiation caused by severe pressure to her throat resulting in a fractured neck bone, and from being held underwater to the point that her lungs filled with fluid. No reasonable juror could find Walker committed only manslaughter.
Walker fails to present this Court support for an instruction of manslaughter under § 93-3-27, killing without malice. This issue is procedurally barred and, alternatively, without merit.

V. WHETHER THE TRIAL COURT ERR IN FAILING TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A SEARCH WARRANT ISSUED WITHOUT PROBABLE CAUSE?
The State admits the search warrant obtained for Walker's trailer was based on the interview by the sheriff's department with Trina Perry, Walker's former girlfriend. Perry related to officers the events of the night Edwards was last seen. Perry reported that shortly after she arrived at Walker's trailer at about 2:00 a.m., Walker and Riser appeared. Perry noticed Walker was not wearing a shirt and had a reddish colored stain on the leg of his blue jeans.
A search warrant for the trailer in which Walker lived with his mother was obtained, listing the following particular items subject to seizure:
 One pair of blue jeans with reddish colored stain on right leg
 One ladies ear ring [sic] further described as being 2 silver colored hoops with pieces of crystals hanging down

*599  One ladies black long sleeve dress
 One pair of ladies black high heel shoes, approx. 2-3 inches [sic] heels
 One silver colored bangle bracelet
Walker argues "mere suspicion" was the only basis for the search warrant. He contends that because no probable cause was established for any items, to include the victim's seized black dress, that the blue jeans were the only item properly listed in the search warrant.
The case of Carney v. State, 525 So.2d 776, 783 (Miss. 1983), and similarly held decisions from other jurisdictions provide Walker's primary support. In Carney, the magistrate issuing the search warrant was informed that the police had reliable information that a stolen radio and television from a recent burglary were in Carney's home. Id. at 781. The search warrant listed the radio and television and "other items," such as small pieces of jewelry stolen in the robbery, although police had no information that the items were in Carney's home. In exercising the search, the police uncovered several envelopes containing marijuana and other paraphernalia. The marijuana was found after the t.v. and radio were located, in such places as under a large spool of cable, inside an old stove in the yard, and inside envelopes on top of a bar and a refrigerator.
On appeal, this Court determined no probable cause existed to support the inclusion of the "other items" in the search warrant. The Court stated two results might follow from these facts; "that the portion of the warrant not based upon probable cause was invalid," or "that the inclusion of these items taints the entire warrant." The Court determined "it furthers this State's policy of encouraging the use of warrants to sever the properly listed items from the improperly listed ones," and so applied the familiar plain view doctrine to hold that "only that contraband discovered in plain view during the search for the television and radio is properly admissible." Id. at 787.
Returning to the instant case, Walker would have this Court hold that all evidence seized other than the blue jeans is inadmissible. To determine whether any property was validly seized, it is necessary to determine to what extent the warrant was valid. The Carney Court cited with approval the leading case on severability of a search warrant, Aday v. Superior Court, 55 Cal.2d 789, 13 Cal. Rptr. 415, 362 P.2d 47 (1961), which held that a search warrant with certain defects did not automatically invalidate the entire warrant. "Such a conclusion would mean that the seizure of certain articles, even though proper if viewed separately, must be condemned merely because the warrant was defective with respect to other articles." Carney, 525 So.2d at 784-85, citing 2 W. LaFave, Search and Seizure, pp. 257-58.
The Carney Court continued:
The Aday rule is sound; it would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well.
The lawful portion of any search warrant determines the permissible intensity of the search. The Supreme Court has stated, "The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still." Further, the duration of the search is likewise determined by the warrant.
Id. at 785 (citations omitted).
Applying the above settled principles relative to search warrants to Walker's case, Walker concedes that there was probable cause to support a search warrant for the stained blue jeans. Perry was at Walker's trailer when he arrived wearing such blue jeans, supporting the "fair probability" that the jeans would be found in the trailer. Lee v. State, 435 So.2d 674, 676 (Miss. 1983), quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Regarding the other listed items, however, all were personal clothing and jewelry known to have been worn by Edwards on the night she disappeared and not later discovered at the crime scene. This alone is not enough to justify the issuance of a search warrant for those items simply because Walker was the primary murder suspect. Thus, the search warrant was not justified beyond the blue *600 jeans. Since Edwards' black dress was the only item of Edwards' seized and used at trial, further discussion is limited to that item.
Having determined that the search warrant was lawful only as to the jeans, the question of whether the black dress was legally seized under the plain view doctrine is raised. Any place the blue jeans might reasonably have been located was an appropriate place to search. Glen LaPraire of the Sheriff's Department testified concerning the discovery of the dress and identified a picture of dress:
Q: All right, sir, and at the time that you found the dress, can you tell us what happened regarding the dress of the contents of this exhibit?
A: Yes, sir. At first I didn't realize what is was, and it was hanging there. I moved it to spread it out to make sure it was a dress. It was still damp; and when I realized it was a dress, I contacted Investigator Phillips who was a crime scene technician and he came and photographed the dress and took it into evidence.
We find that there was no error in admitting the black dress into evidence at trial. The search warrant for the blue jeans only was supported by probable cause based on Trina Perry's interview. The scope of the officers' search could properly include any area of the trailer the jeans could reasonably be concealed. Since the dress was found hanging from the front of a closet door, it was certainly within one's plain view. Finally, the fact that the stained blue jeans were never discovered meant the duration of the permissible search was not unlawfully extended. There was no error in the admission of the black dress into evidence.
This issue is without merit.

VI. WHETHER THE ADMISSION OF A PHOTOGRAPH OF THE DECEASED, TAKEN BEFORE HER DEATH, VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND THE FEDERAL AND STATE CONSTITUTIONS?
Walker failed to object to the admission of the photograph at issue and is therefore barred from raising the issue on appeal. Chase v. State, 645 So.2d at 835 (Miss. 1994); Foster v. State, 639 So.2d at 1289. Alternatively, without relaxing the bar, Walker fails to convince this Court of any merit to this claim. In multiple arguments concerning the use of photographs both in the guilt and sentencing phases of trial, Walker first complains that the use of a photo of Edwards taken before her death was irrelevant and was used purely to evoke the sympathy of the jury.
The State responds that any objection by Walker to the use of the photograph of Edwards is raised before this Court for the first time and therefore comes too late. The record supports that not only did counsel for Walker fail to voice any objection to this photograph, he expressly consented to its use:
MR. SAUCIER: Your Honor, I believe all items have been marked into evidence with the exception of one picture that we have, in fact, repeatedly shown to witnesses, which I think is marked for identification purposes only as Exhibit 1; and we would ask the Court now to allow that exhibit into evidence. Exhibit 4; I'm sorry.
MR. STEGALL: Which one is that?
THE COURT: The one that various people have testified as to being a picture of Konya Edwards.
MR. STEGALL: I don't have any objection.

THE COURT: All right. It will be received into evidence as State's Exhibit 4.
Because Walker consented to the admission of the photograph into evidence and raised no objection, this issue is procedurally barred. As previously set forth, this Court need not address any issue presented for the first time on appeal. Since no objection was made in Walker's case, the error, if any, is waived. Chase v. State, 645 So.2d at 835, and cases cited therein. Alternatively, without relaxing the bar, we examine the merit of the issue.
*601 "This Court has held that in considering the competency, relevancy and materiality of photographs, it is within the sound discretion of the trial judge to determine whether or not the photographs have a legitimate evidentiary purpose." Voyles v. State, 362 So.2d 1236, 1241 (Miss. 1978); Irving v. State, 228 So.2d 266 (Miss. 1969); Martin v. State, 217 Miss. 506, 64 So.2d 629 (1953); Coleman v. State, 218 Miss. 246, 67 So.2d 304 (1953).
In Bullock v. State, 391 So.2d 601 (Miss. 1980), for instance, this Court succinctly disposed of the appellant's objection to the introduction of a high school photograph of the victim: "Appellant objected to its introduction on the ground that it was irrelevant and inflammatory. The trial judge did not abuse his discretion in admitting the photograph." Id. at 609 (further cites omitted).
The photograph of Edwards taken before her death was shown, without objection, to witnesses Tillie Edwards, Jason Riser and Trina Perry for identification purposes. It is true that the identity of Edwards was ultimately stipulated. Even so, "[a]s a general rule, the fact that a photograph of the deceased in a homicide case might arouse the emotions of jurors does not of itself render it incompetent in evidence so long as introduction of the photograph serves some legitimate, evidentiary purpose." May v. State, 199 So.2d 635, 640 (1967). Here, the photograph was shown to witnesses, who identified Edwards. At the point when the photo was shown to her, the grandmother, who was arguably the most emotional witness, identity was not yet stipulated. The photograph of Edwards was never observed by the jurors during the trial and Walker did not challenge its introduction into evidence.
Walker's argument that the photograph was used to evoke sympathy is procedurally barred and alternatively without merit.

VII. WHETHER THE ADMISSION OF PHOTOGRAPHS OF ALAN DALE WALKER VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND THE FEDERAL AND STATE CONSTITUTIONS?
Walker objects to the use of photographs of himself, standing with Jason Riser and/or Trina Perry, inside his trailer on the night of the murder. One photograph depicts Walker without a shirt, generally unkempt, holding a beer can, and sticking his tongue out. Citing only one case, Walker argues that these pictures were "extremely inflammatory," and "served no evidentiary purpose."
The State responds that these photos admitted during the testimony of Trina Perry were simply "descriptive of events that happened" during the evening. See e.g., Parker v. State, 514 So.2d 767, 771 (Miss. 1986) and cases cited therein.
In Parker, the Court stated that "some `probative value' is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence." Id. at 771. The Parker Court found no abuse of discretion in the admission of presumably unpleasant photographs of a burned victim's clothing being removed, among others. The Court commented: "Both pictures admitted into evidence have other people present therein and are therefore descriptive of events described at trial." Id.
The same reasoning should apply to the admission of the photos of Walker, used simply to support the testimony of Perry. The photographs at issue clearly corroborate Perry's testimony that she was with Riser and Walker immediately prior to the occasion of Edward's killing and again shortly thereafter at Walker's house. The photographs were descriptive of events that happened as testified to by Riser and Perry. As Riser put it, we were "acting as though nothing had happened." This issue is without merit.

VIII. WHETHER THE ADMISSION OF THE GRUESOME PHOTOGRAPH OF THE DECEASED VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND THE STATE AND FEDERAL CONSTITUTIONS?
Walker complains that the admission of a single photograph of the burned body of *602 the victim, Exhibit 1-E, for use in the sentencing phase of the trial only, was error. Specifically, Walker argues since identity was not in issue, the gruesome photo was cumulative to the testimony of Officer Buriss, who investigated the crime scene and photographed the body. Walker concludes the photo served no legitimate purpose other than to prejudice and inflame the jury.
The State argues that the photo went to proving the aggravating factor that the killing was committed "for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." See Miss. Code Ann. § 99-19-101(5)(e).
Walker counters by arguing that the State incorrectly equates the burning of the corpse to hinder identification of the victim to a killing committed to avoid or prevent arrest.
In Hansen v. State, the Court cited its familiar pronouncement on this aggravating factor:
If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating factor.
592 So.2d 114, 153 (Miss. 1991), citing Leatherwood v. State, 435 So.2d 645, 651 (Miss. 1983). The Hansen Court concluded the avoiding arrest aggravator was properly presented to the jury where evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.
The trial court denied admission of the photograph at issue during the guilt phase of Walker's trial. At sentencing, the prosecutor argued that photographs of the victim were among the evidence that proved Walker and Riser killed Edwards and attempted to destroy any evidence of their crimes in an effort to avoid detection. The prosecutor argued: "For example, the hands were burned more severely than the feet, and we believe that this photograph provides graphic evidence of the fact that their intent was to avoid arrest." Only the single photograph, Exhibit E-1 was permitted. The court reasoned:
The other view, which is the view of the body laying [sic] in the woods, ... I can certainly see where the photograph could have some probative value as far as the aggravating circumstances are concerned to give a better description to the jury as to the extent of the burns. Dr. McGarry did describe the condition of the body in great detail, I felt. However, the picture tells the story of a thousand words, so I'll allow the picture in.
As this Court noted in Shell v. State, 554 So.2d 887, 902 (Miss. 1989), rev'd on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), "[w]e have repeatedly admitted photographs of every description with the explanation that some `probative value' is present." Although it must be conceded that Exhibit E-1 in this case is most unpleasant, even gruesome, it cannot be said that it served no legitimate evidentiary purpose. Combined with the statements attributed to Walker that following the attacks on Edwards, she would have to be killed and the body burned, the photograph illustrating the extent of Walker's efforts to cover his tracks was probative on the avoidance of arrest aggravator.
Finally, this Court in Chase v. State, 645 So.2d at 858, quoting Leatherwood v. State, recently reminded us that "each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer," then the jury should be presented evidence on this aggravating circumstance. Exhibit E-1 is but one piece of evidence on the avoiding arrest circumstance in Walker's case.
Walker earlier that night determined Edwards would have to be killed and then decided to burn her body. The jury could have properly inferred that the decision to burn the body was to prevent fingerprints revealing Edwards identity, pubic hair samples for comparisons, and destruction of fibers for comparisons in order to conceal Walker's *603 identity, cover his tracks and avoid arrest or apprehension. The jury could infer all of the above were probative on the avoidance of arrest aggravator and a substantial reason for Edward's killing. The photo was properly admitted into evidence during the sentencing phase to support the State's position that the killing was done in part to avoid detection and arrest. This issue is without merit.

IX. WHETHER THE ADMISSION OF PORTIONS OF DR. McGARRY'S TESTIMONY VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND FEDERAL AND STATE CONSTITUTIONS?
In a very brief argument, citing only M.R.E. Rule 402, defining "relevant evidence," and Rule 403, Walker contends the trial court should have limited the testimony of the State's pathologist. Dr. Paul McGarry testified, according to Walker in "nauseating detail," on the condition of Edwards' body at the time of the autopsy and on the cause of death determined by the results of that autopsy. Walker specifically points to McGarry's testimony at pages 1404-1407, 1412, and 1414 of the transcript.
The record indicates that at only one point, at the end of Dr. McGarry's direct examination, did Walker offer an objection relevant to this issue. This objection was based on "him repeating the testimony." The court sustained the objection. No further action was requested or necessary. This Court has stated that "the corpus delicti in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death." Steele v. State, 544 So.2d 802, 808 (Miss. 1989), citing May v. State, 524 So.2d 957, 966 (Miss. 1988), and case cites therein. In order for the State to meet its burden of proving the crime of capital murder beyond a reasonable doubt, the cause of death can be established by expert medical testimony. Dr. McGarry opined within a reasonable medical certainty that Edwards' death resulted from the combination of the injury to her neck and being held underwater, resulting in asphyxiation.
M.R.E. Rule 402 simply provides all relevant evidence is admissible. The testimony of Dr. McGarry was without question relevant to several aspects of the State's case, and does not appear more prejudicial than probative under Rule 403.
This issue is without merit.

X. WHETHER THE TRIAL COURT ERRED IN ADMITTING AS EXHIBITS AND ALLOWING THE JURY TO TAKE INTO THE JURY ROOM THE TRANSCRIPT AND VIDEOTAPE OF JASON RISER'S STATEMENT?
The focus of this alleged error is Exhibit 12, an edited videotape of the statement of Jason Riser relating the events of September 8-9, 1990 to the police. This issue arose during cross-examination of Riser by Walker's counsel, Stegall. Stegall was trying to impeach Riser's courtroom testimony with Riser's prior statement given to police. Stegall wanted fourteen copies of Riser's statement, so that all of the jurors could follow along during his cross-examination. The State agreed, but added that if the transcript of the statement went into evidence, the videotape should be admitted too. Stegall ultimately agreed to the videotape subject to modifications, necessary to remove Riser's comments on the videotape to another murder committed by Walker. Walker's counsel was asked by the trial judge whether he was "satisfied that the portion which should have been deleted has been deleted properly?" Stegall responded, "Yes, sir."
Walker here argues the trial court erred in allowing the videotape along with its typewritten transcript into the jury room without instructions limiting its use. The possibility of repeated viewing, Walker contends, permitted the jury unlimited access to the testimony of Walker's main accuser, unduly emphasized. Walker submitted no such instruction at trial and cannot now complain for the first time.
The State submits the intent of the trial court was exactly the opposite from Walker's complaint; the judge changed his initial determination that the tape would be played in open court following the cross-examination of Riser because "playing the tape at the conclusion of that testimony to the jury and for them to follow the document, ... would be, in effect, repeating the same evidence twice or more to the jury."
*604 Addressing the merits of this claim, both sides cite this Court's decision in Pettit v. State, 569 So.2d 678 (Miss. 1990). Therein, a tape recording of a drug transaction was played once in its entirety during the trial, and some portions played twice. During closing arguments, defense counsel encouraged jurors to replay the tape which arguably supported Pettit's testimony. The trial court, however, did not permit the jury access to the tape during its deliberations, commenting, "Just a moment. They can't listen to the tape any more than they already have. It does not go back into the jury room any more than a transcript of what other witnesses said." Id. at 680.
This Court looked to a variety of sources to determine whether the trial court was correct to exclude the tape recording from the jury room:
Miss. Code Ann. § 99-17-37 (1972) states that `[a]ll papers read in evidence on the trial of any cause may be carried from the bar by the jury.' More to the point, Miss. Unif.Crim.R.Cir.Prac. 5.14 states in part: The court shall permit the jury, upon retiring for deliberation, to take to the jury room a copy of the instructions and exhibits and writings which have been received in evidence, except depositions.
Id. at 680. The Court also considered the opinion of Coulter v. State, 506 So.2d 282 (Miss. 1987). Coulter assigned as error his confession being taken into the jury room. This Court, citing Rule 5.14, quickly disposed of this claim, emphasizing the rule's mandate that the court shall permit the jury access to all exhibits and writings received into evidence, except depositions. Id. at 286.
Returning to Pettit v. State, this Court held that the trial court should have permitted the tape recording to go to the jury:
We hold that, considering Coulter and the language of 5.14, the rule is, within reason, mandatory. The trial court would have discretion to withhold exhibits that might be dangerous or prone to destruction. There is the possibility that, even though a tape recording is submitted to the jury, the jury will not ask to have it played. The trial court would also have broad discretion to regulate the presentation of the tape recording to the jury, such as limiting the number of replays.
State's Exhibit 1 [the tape recording] is of poor quality. The jury heard it once in its entirety, and then heard certain parts a second time. Though the trial court erred when it refused to let the tape recording go to the jury with the other exhibits, the error was harmless under the circumstances.
569 So.2d at 680.
Applying the reasoning of the Court in Pettit, this Court has made clear that evidence such as the videotape here at issue should be given to the jury unless, within the court's discretion, the trial judge has a valid reason to exclude it from the jury room. Stegall's purpose in requesting the fourteen copies of Riser's statement, which opened this Pandora's box, was to allow jurors to follow along and readily see the obvious conflicts between Riser's live testimony as compared to his prior statement. Stegall subsequently agreed to the admission of the amended videotape. Had the court not allowed the videotape in question into evidence in Walker's case, it certainly would have been error since the jury never viewed the tape in court and would have had no other opportunity to do so.
Walker briefly argues that the videotaped statement of Riser is the functional equivalent of a deposition, which Rule 5.14 specifically prohibits in the jury room. The concern here is obviously one of confrontation, in that the videotape was made in a room where only Riser and the officers questioning him were present. The State cites Carson v. Collins, 993 F.2d 461 (5th Cir.1993), in support of its position that the cross-examination of Riser at trial adequately covered Walker's right to confront his accuser. The Fifth Circuit stated:
The Supreme Court has noted that introduction of out-of-court statements, even if unreliable, does not violate the confrontation clause where the declarant testified at trial subject to full and effective cross-examination. In the instant case, Carlette testified at trial about her charges against Carson and was subjected to full and effective cross-examination. Carson had full and unrestricted opportunity to test before the jury both Carlette's allegations of sexual abuse and the circumstances under which she made her videotaped statement, *605 with the benefit of both the oath and of face-to-face confrontation. The confrontation clause requires no more.
Id. at 464.
The record shows that Riser testified at trial and was subjected to extensive cross-examination by the defense. The confrontation issue was satisfied in the case sub judice. In fact, the cross-examination comprised over 100 pages of the trial transcript. In addition, the jury deliberated in the guilt phase from 4:37 p.m. until 5:58 p.m., a total of only eighty-one minutes. Sentencing deliberations lasted somewhat longer, from 2:52 p.m. until 5:30 p.m. The videotaped statement by Riser was approximately fifty-five minutes long. The jury certainly did not repeatedly view the tape as Walker suggested could have occurred.
Walker's only support for his argument that the videotape should be treated like a deposition and thereby not permitted in the jury room is Hendricks v. Swenson, 456 F.2d 503 (8th Cir.1972). Walker cites language by the Appeals Court that "no valid distinction exists between the use of a deposition taken by videotape and the use of a statement taken by video tape." Id. However, Walker neglects to mention that the Hendricks Court made this statement en route to finding that the "Federal Rules of Civil Procedure provide for the taking of depositions by other than stenographic means and presuppose their use in court." (cite omitted). The Hendricks Court concluded that appellant's videotaped statement to police was properly admitted into evidence. It was stated: "For jurors to see as well as hear the events surrounding an alleged confession or incriminating statement is a forward step in the search for the truth." Id. at 507.
Finally, in Doby v. State, 557 So.2d 533 (Miss. 1990), this Court made the following observations about a tape recording of an alleged drug transaction:
In addition, we regard it a better practice that the tape recording be played before the jury by one competent to operate the tape recorder to guard against erasures or other technical or mechanical problems, although there is no error per se in merely giving the recording (or any other exhibit for that matter) to the jury to consider during the course of its deliberations rather than taking up the time of the court to hear it at trial.

Id. at 542 (emphasis added).
For all of the above-stated reasons, there was no abuse of discretion or other error in the decision to allow the jury to have available to them the videotaped statement of Riser.
This assignment is barred for failure to object, and alternatively on the merits, offers no basis for reversal.

XI. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT ALAN DALE WALKER WAS GUILTY OF CAPITAL MURDER IF HE "DID ANYTHING IMMEDIATELY CONNECTED WITH THE CRIME OR LEADING TO ITS COMMISSION?"
Walker failed to properly object, and thus his claim now is procedurally barred. The focus of this issue is Walker's challenge to the granting of Instruction S-9, which read:
The Court instructs the Jury that each person present at the time and consenting to or encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hands committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the Defendant, ALAN DALE WALKER, did wilfully, unlawfully, knowingly and feloniously do any act which is an element of the crime with which he is charged, namely Capital Murder, or immediately connected with it, or leading to its commission, then and in that event, you should find the Defendant, ALAN DALE WALKER, Guilty of Capital Murder.
Walker did not individually list Instruction S-9 in his written objections submitted to the trial court. We note that Instruction S-10, practically identical to S-9, was also not objected to by Walker. Walker again generally argues that the State cannot prove that the murder occurred during the commission of a sexual battery. He writes: "The problem *606 here is that there is no proof that the Defendant's intent to commit sexual battery, if any, was formed before the death of Konya Edwards." The assignment is procedurally barred since Walker's only stated objection to S-9 was on other grounds than that now claimed on this appeal. Conner v. State, 632 So.2d 1239, 1255 (Miss. 1993); Fleming v. State, 604 So.2d 280, 292 (Miss. 1992). Questioned by the trial court concerning his basis for objection, counsel stated, "We don't feel that the ... testimony of Riser is corroborated in any fashion which would justify the instruction being given."
Walker's only challenge to S-9 was thus clearly in the nature of an attack on the sufficiency of the evidence justifying the instruction. Before this Court, however, Walker contends the language of S-9 allowed the jury to convict Walker of capital murder if they found Walker "knowingly committed any act connected to or leading to the `whole offense' regardless of whether he had the intent to commit the underlying felony." Walker's objection at trial concerning the lack of corroboration of Riser's testimony went to sufficiency of the evidence and had nothing to do with what he now argues for the first time on appeal. Walker did not object at trial to the instruction on the basis of Walker's lack of specific intent to commit the underlying felony.
This assignment is barred since the specific objection to the instruction argued on appeal was not raised at trial.

XII. WHETHER THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE IN THAT IT FORBADE CONSIDERATION OF THE LESSER INCLUDED OFFENSE UNTIL AND UNLESS THE JURY HAD FIRST ACQUITTED THE DEFENDANT OF THE GREATER CHARGE. SUCH AN INSTRUCTION VIOLATES THE DUE PROCESS CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS?
The record reveals that not only did counsel for Walker fail to object to S-2, he expressly stated he had no objections:
THE COURT: All right. Do you have a C-20, which was stating to the jury that if the State failed to prove the essential elements of a capital murder, that they could proceed with their deliberations on the lesser included offense? It's basically the same statement as that but is included already in one of the State's instructions. So I'm just going to hold it over to the side right now.
MR. CARANNA (D.A.): I haven't seen that one 
THE COURT: Well, I'm going to hold it over to the side anyway because 
MR. CARANNA: All right.
THE COURT:  your instruction states basically the same thing in one particular area. We'll go with the State's instructions next ...
THE COURT: ... All right; then we go to S-2, and this is the one that basically recites what the Court's C-20 was, and that is that 
MR. CARANNA: May I see the Court's?
THE COURT: All that mine did was just the lesser included language that you have in the preface to this one. I prefer to go with the State's S-2 as opposed to  what does the defendant say as to S-2?

MR. STEGALL (Defense): The defendant has no objection.

THE COURT: No objection?

MR. STEGALL: No.

THE COURT: S-2 will be given, and so that means that my C-20 is removed.
MR. STEGALL: Obviously, Judge, for all these we're not waiving any original objections that we had; for example, a rape shouldn't be  we're just saying this is, in our opinion, a correct statement of the law.

Once again, since Walker offered no contemporaneous objection to Instruction S-2, he should not now be heard to complain. *607 Carr v. State; Willie v. State, 585 So.2d 660, 680 (Miss. 1991), citing Moawad v. State, 531 So.2d 632, 635 (Miss. 1988). This assignment is procedurally barred.
Alternatively, without relaxing the bar, but analyzing its merits nonetheless, we find no merit to Walker's claim. Before this Court, Walker objects to the language of Instruction S-2, the challenged portion of which reads as follows:
The Court instructs the Jury that if you find from the evidence in this case that the Defendant, ALAN DALE WALKER, is not guilty of the crime of Capital Murder, then you may proceed with your deliberations to determine whether the State has proven, beyond a reasonable doubt, all of the elements of the lesser crime of Murder.
This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge of Capital Murder but does justify a verdict for the lesser crime of Murder.
However, notwithstanding this right, it is your duty to accept the law as given you by the Court; and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to accept the law as given you by the Court; and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense.
In Carr, this Court rejected an identical argument by the appellant that an instruction similar to S-2 in the case sub judice, was an "acquit-first type instruction," the effect of which Walker argues, was to "coerce jurors who believed Walker guilty of a lesser charge" into convicting him for capital murder instead. Walker cites cases which generally held unconstitutional statutes which disallowed any consideration of lesser included offenses. He contends giving "coercive" lesser offense instructions is equally problematic.
In Carr, the appellant objected to language in several instructions which provided:
If the state fails to prove beyond a reasonable doubt ... any one or more of these elements, then you shall find the defendant not guilty of capital murder under [Count I, Count II, Count III, and Count IV], and you shall then proceed to consider the lesser included offense of murder... .
This Court reviewing the entire charge to the jury found no error in the challenged language.
The Court stated:
Carr offers a number of cases from other jurisdictions that have found this `acquit first' type instruction fundamentally flawed. These other jurisdictions substitute an instruction permitting consideration of the lesser included offenses if the juror cannot agree on a verdict of the greater charge after a reasonable amount of time. However, none of the cited authority is binding on this Court.
Carr asserts that nothing in Mississippi law requires the `acquit first' instruction. The corollary to his argument is that nothing in Mississippi jurisprudence forbids it either.
Slip Op. at 606-07.
Like Carr, Walker also cites cases from other jurisdictions disapproving of "acquit first" instructions. Walker further compares his case to that presented in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). That case is distinguishable in that the United States Supreme Court held unconstitutional that portion of Alabama's capital murder sentencing statute which precluded the jury from considering a conviction for a lesser included offense as a third option to a verdict to acquit or convict of the capital offense. Here, the jury was instructed by S-2 on the lesser crimes of both murder and manslaughter.
The State cites language from Dresnek v. State, 697 P.2d 1059 (Alas.App. 1985), applicable to Walker's argument that only after acquitting him of capital murder was the jury permitted to consider the lesser crimes:
In a sense this is a difficult proposition to prove since a lesser-included offense by definition is included in the greater offense. *608 Consequently, a jury cannot consider the elements of the greater offense without simultaneously considering the element of the lesser-included offense.
Id. at 1062.
This Court has consistently stated that jury instructions must be considered as a whole. Roundtree v. State, 568 So.2d 1173, 1177 (Miss. 1990). "This same logic is reflected in the holding of this Court that instructions should be read in their entirety to determine if there was error." Chase v. State, 645 So.2d at 852, citing Anderson v. State, 381 So.2d 1019, 1024 (Miss. 1980). To that end, Instruction S-2 in its entirety correctly set out the offenses of capital murder, murder and manslaughter for the jury's consideration. No error is indicated in the form of this instruction, which is also in accordance with Mississippi Model Jury Instructions, 1977, Instructions C.20 and C.21. Finally, in addition to this Court's finding in Chase there was no error in giving an instruction similar to S-2, a number of other jurisdictions have expressly approved of such. See State v. Wilkins, 34 N.C. App. 392, 238 S.E.2d 659, 664-65 (1977); State v. Wussler, 139 Ariz. 428, 430, 679 P.2d 74, 76 (1984).
This issue is barred for failure to object and, alternatively, considering the underlying merits of the claim, we find none.

XIII. WHETHER DEFENSE COUNSEL'S CLOSING ARGUMENT TO THE JURY WAS LIMITED IN VIOLATION OF MISSISSIPPI LAW AND THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?
Walker's counsel contends that although he was never given a decisive statement of how much time was allotted for his closing argument, he was prohibited from concluding.
The State responds that both sides were adequately informed on the time limitations for closing arguments. Further, the State correctly submits what Walker's counsel before this Court is really attacking is the denial of a mere four additional minutes to summarize.
"Generally the amount of time granted for closing argument rests within the sound discretion of the trial judge." Willie v. State, 585 So.2d 660, 675 (Miss. 1991), citing Gray v. State, 351 So.2d 1342, 1346 (Miss.), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1977). This Court in Willie cited decisions holding that time limitations on closing arguments ranging from twelve minutes in a capital murder case to thirty minutes in a case of discharge of a firearm into a dwelling constituted abuse of discretion by the trial judge. Willie, 585 So.2d at 675, citing Gray, 351 So.2d at 1346; Ray v. State, 330 So.2d 580 (1976). In the case at bar, Walker's counsel was given one full hour to make his closing argument. The record indicates that no objection to this allotment of time was made by either side:
THE COURT: How do you want to divide your time, State?
MR. SAUCIER: Thirty and thirty with a two-minute warning, please, for me.
THE COURT: Two-minute? Who is going to open; you?
MR. SAUCIER: Yes, sir.
THE COURT: Thirty and thirty. What kind of warning do you want?
MR. CARANNA: Five and two, if I could, please.
THE COURT: Five and two. All right, sir. Mr. Stegall, what kind of warning do you want.
MR. STEGALL: About five minutes.
THE COURT: Five minutes; okay.
At the end of defense counsel's hour, the trial judge called "time." Attorney Stegall requested an additional five minutes. The judge denied the request, stating, "We set the time earlier. Time is up." However, after a bench conference requested by the State, defense counsel was allowed one additional minute to conclude his argument. Counsel was subsequently permitted to place the remaining topics of his closing argument into the record on proffer.
The trial court remarked for the record that neither side objected to the one hour allotted. The judge concluded: "The defense *609 counsel requested an additional five minutes of arguments, which the judge felt was an improper request since the time asked for was granted. However, I did give an additional one minute for him to close his arguments." The trial judge, prior to commencing closing arguments, told the jurors to take a break if they needed, because, "it could take up to two hours." Although the record could have been better preserved, there can be no doubt from what does appear on the record that each side was granted one hour for closing argument.
The trial court noted it was defense counsel who originally requested the one hour period. Stegall failed to challenge the trial judge on this statement.
In Willie, this Court stated that "[d]espite the [time] limitation, if Willie had sufficient time to give his closing argument, we will not reverse." 585 So.2d at 676. Cf. Hollins v. State, 340 So.2d 438, 441 (Miss. 1976). Willie requested 25 minutes to argue at the sentencing phase, and was granted only 15. Willie, 585 So.2d at 675. The Court determined Willie's request to proffer the uncompleted portions of his sentencing argument "clearly demonstrated that he was prejudiced by not being allowed to make a full and complete closing argument." Finding an abuse of discretion, this Court reversed and remanded for a new trial on sentencing. Id. at 676. Interestingly, we note in the case sub judice, at the penalty phase, the trial judge again asked how much time defense counsel wanted for closing argument, to which Stegall replied three hours. The trial judge granted Stegall the three hours closing argument time requested.
Walker offered no objection to the one hour limitation and did not raise this issue in his motion for new trial. Having had one hour to present his closing argument, and an additional one minute to summarize, Walker would be hard-pressed to prove he was prejudiced by the denial of more time. Walker's proffered subjects indicate that most were touched upon during the one hour. This Court holds that a one hour limitation does not "unduly limit" counsel's ability to fully argue his case. Counsel certainly cannot be permitted to argue without limit. Case law supports that this generous amount of time should have been adequate, assuming organization and a wise use of counsel's time.
The trial judge has the duty of conducting an orderly trial. It is also his duty to see that the court's time is used economically. Likewise, the trial judge is allowed discretion in the conduct of a trial.
Turner v. State, 220 So.2d 295, 297 (Miss. 1969) (all further citations omitted). Had counsel been allowed only thirty minutes, for instance, to present his summation, Walker possibly might have a valid claim in view of the serious charges against him. See Ray v. State, 330 So.2d at 586 (Miss. 1976) ("[T]he court should not unduly limit the time allowed an accused to present his summation to the jury. The facts developed by the state to implicate the accused in the crime charged were involved and complicated, and, in our opinion, the trial court abused its discretion in restricting counsel for appellant to thirty minutes to argue this case... .").
However, in view of the amount of time Walker requested, was granted, and utilized for closing argument at the guilt phase of trial; the fact that this was not a factually complex case, the jury hearing from only eight witnesses; and considering that the argument made on proffer appears largely repetitive, there was no abuse of discretion by the trial court.
This Court today finds, as did the Turner Court that "the court properly exercised its prerogative in carrying out its duties," and that "the conduct of the trial was not prejudicial to the appellant... ." 220 So.2d at 298. Walker was allowed to conclude his argument. Walker's position that he should have been allowed more than one hour for closing argument is without merit.

SENTENCING PHASE ISSUES

XIV. WHETHER THE TRIAL COURT ERRED IN ALLOWING EVIDENCE AND ARGUMENT IN THE SENTENCING PHASE WHICH WAS NOT RELATED TO ANY AGGRAVATING OR MITIGATING FACTOR?
Walker challenges the testimony of Robert Burriss, crime scene technician from *610 the Biloxi Police Department. Burriss was the State's only witness at the sentencing phase. Burriss testified to the burned condition of Edwards' body, and stated that the most severely burned parts were the hands and the pubic area. Burriss testified that the burning of these two areas, in particular, hampered investigation efforts because they did not permit fingerprints or pubic combings to be made. Accompanying Burriss' testimony was a photograph, Exhibit 1, portraying the burned body of Edwards in the field. Burriss stated he took the photograph which accurately portrayed the body at the crime scene as discovered on September 11.
Walker argues neither Burriss' testimony nor the photograph went toward the aggravating circumstance of "avoiding arrest," for which the State submits it was offered. Walker writes: "Events that took place after the killing to hide the killing are in no way probative of whether the murder, itself, was committed to avoid arrest." Walker cites only Herzog v. State, 439 So.2d 1372 (Fla. 1973), in support of this position.
In Herzog, the Florida Supreme Court held that the "avoiding arrest" aggravator, among others, should not have been given. The trial court listed the fact that the victim was transported to a desolate area and her body set on fire, and that the appellant, two months after the murder misled police as to her whereabouts, in support of this aggravator. Ultimately, Herzog fatally strangled the victim, his fiancee at a point when she was already unconscious. 439 So.2d at 1379-80. The State argued the "avoiding arrest" aggravator was supported by the killing of the victim with the intent to avoid arrest for an aggravated battery occurring sometime prior to her death.
The Florida Court held the avoiding arrest aggravator circumstances primarily applied where law enforcement persons are killed in an effort to avoid arrest or to effectuate an escape. The Court continued: "It may also be applicable when the fact finder determines that the dominant motive of the murder was for the elimination of witnesses." Id. at 1379, citing White v. State, 403 So.2d 331, 338 (Fla. 1981) (citing Riley v. State, 366 So.2d 19 (Fla. 1978), reh'g denied, 459 U.S. 1138 (1982)). The Court held neither situation applied to justify giving the aggravator.
The Herzog Court distinguished Welty v. State, 402 So.2d 1159 (Fla. 1981), where the defendant, intending to steal from the victim, entered the victim's apartment, strangled the victim, and set fire to his bed. "Hence, the homicide was committed for the purpose of avoiding arrest for the crimes of burglary and larceny. Had Welty's victim's life been spared, he would have been able to identify the perpetrator who had spent several hours with him earlier that evening." Herzog, 439 So.2d at 1379, citing Welty, 402 So.2d at 1161. In determining whether the avoiding arrest aggravator was improperly given, the Herzog Court found there was no evidence to support "a finding that a previous aggravated battery had occurred, and that the motive for the homicide was to avoid arrest." 439 So.2d at 1379.
Our own case law is similar to that of Florida; within the broad definition of a killing committed for the purpose of avoiding or preventing a lawful arrest are included those killings committed in order to conceal the killer's identity, to cover his tracks and to avoid detection or arrest. In Chase v. State, 645 So.2d at 858, this Court found both testimony and physical evidence which justified the avoiding arrest circumstance. The Court stated:
The cases ... clearly indicate that the key to resolving this question of avoidance of arrest lies squarely on whether or not evidence existed within the record which would have allowed the jury to make reasonable inferences therefrom that the concealing of Chase's identity, and the covering of his tracks in order to avoid detection, apprehension and arrest, was a substantial reason for the killing of Elmer Hart.
Id.
Both Burriss' testimony and Exhibit E-1 revealed the extent of the victim's burns and illustrated that the areas most likely to reveal the killer's identity were crudely destroyed. The trial court correctly determined the testimony, together with the admission of a single photograph during the *611 sentencing phase was relevant to the avoiding arrest aggravating circumstance.
This issue is without merit.

XV. WHETHER THE AVOIDING ARREST CIRCUMSTANCE WAS IMPROPERLY SUBMITTED TO THE JURY AND INADEQUATELY DEFINED, IN VIOLATION OF STATE LAW AND THE EIGHTH AMENDMENT?
Walker submits the avoiding arrest aggravator should not have been given because, without a limiting instruction, it is unconstitutionally vague and because, he again alleges there was insufficient evidence to support this circumstance. Miss Code Ann. § 99-19-101(5)(d) (Supp. 1994), requires simply that "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."
Walker argues that because every murder necessarily eliminates a witness to that crime, the avoiding arrest aggravator must be given with a limiting instruction channeling the jury's focus to those situations where there is specific evidence demonstrating that one of the purposes behind the killing was the killer's desire to avoid detection and apprehension for an underlying crime. See State v. Williams, 304 N.C. 394, 284 S.E.2d 437, 455 (1981). However, Walker compares our law to that of surrounding jurisdictions and concedes, "Mississippi, like our sister States, does not equate the killing of the victim with the elimination of a witness in every case."
Walker's contention that this aggravator must be accompanied by a limiting instruction has been repeatedly rejected by this Court. In Hansen v. State, 592 So.2d 114, 152 (Miss. 1991). The Court stated:
It is argued some sort of limiting instruction need be given to narrow this aggravator. In Leatherwood v. State, 435 So.2d 645, 651 (Miss. 1983), we rebuffed this contention, stating, if there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
Under this construction the Court properly submits this aggravator to the jury, if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.
Id. at 152-53.
Next, addressing Walker's argument that there was insufficient evidence to support this aggravator, we consider the following: Walker began asking the victim if she wanted to live or die from the moment the group arrived at the lake. He expressly informed Riser they were "going to have to kill" Edwards. Walker choked Edwards to the point that she was left gasping for breath, then "stomped" the back of her head and neck seven or eight times. Walker tried to drown Edwards. Riser discovered Edwards was still breathing, so Walker put her face under water again. Walker then decided the body would have to be burned, to the extent that the men left the scene, located a gas can, parked their car in a friend's driveway and waited to make certain no one was there before returning with the gas can to the site of the body. Walker expended considerable effort to ignite the body. In the process, Walker stopped to hide the dress the victim had been wearing behind his trailer and warned Riser he would be killed if he ever told anyone of the night's events.
The jury could also consider that the victim was a nineteen year old female, unclothed, in an area from which there was no foreseeable means of escape and with no means to speak of with which she could defend herself from Walker and Riser. Although she offered some resistance to the attacks upon her, the testimony indicated she cooperated for the most part with Walker's orders. Yet Walker still found it necessary to kill Edwards and finally to burn her body utilizing gasoline. The most severely burned areas were the fingers and pubic area, thereby *612 prohibiting fingerprints, fiber and pubic hair comparison.
We find that these facts could sufficiently demonstrate beyond a reasonable doubt to the jury the lack of any logical reason for Edwards' killing by Walker, other than to eliminate her as a witness, prevent identification of Edwards and prevent scientific comparison of evidence linking Walker to the crime, thus enabling Walker to avoid detection and apprehension. We hold that the jury had ample evidence to support that a "substantial reason for the killing" was to avoid detection and arrest for the offenses against Edwards. Walker was obviously concerned about the possibility of being caught; he threatened his good friend, Riser, with death if the fatal assault on Edwards was revealed. As the Court in Chase determined, "the murder ... was only one of many attempts to avoid detection and arrest." 645 So.2d at 858. In the case sub judice it appears to have been a substantial reason for the killing of Edwards.
This issue is without merit.

XVI. WHETHER THE SUBMISSION OF THE AGGRAVATING CIRCUMSTANCE "THAT THE CAPITAL OFFENSE WAS COMMITTED IN THE COMMISSION OF THE CRIME OF SEXUAL BATTERY" VIOLATED MISSISSIPPI LAW AND THE STATE AND FEDERAL CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT?
Walker complains before this Court for the first time that the submission of the statutory aggravator that the capital offense was "committed while the defendant was engaged in the commission of a sexual battery" was improper. Therefore, this assignment is procedurally barred and need not be considered by this Court. Foster v. State, 639 So.2d at 1270; Cole v. State, 525 So.2d at 369.
This Court, without relaxing the bar, alternatively considers the issue on the merits. Walker asserts this aggravating circumstance fails to sufficiently narrow the class of defendants eligible for the death sentence. Walker suggests Mississippi's sentencing provisions are flawed because "a defendant convicted of felony murder has one aggravating circumstance pending in the sentencing phase by virtue of the conviction alone."
The use of the underlying felony, in this case sexual battery, as an aggravator during sentencing has been consistently upheld in capital cases. This Court has stated:
The argument is the familiar "stacking" argument that the state can elevate murder to felony murder and then, using the same circumstances, can elevate the crime to capital murder with two aggravating circumstances. As pointed out in Lockett v. State, 517 So.2d 1317, 1337 (Miss. 1987), this Court has consistently rejected this argument.
Minnick v. State, 551 So.2d at 96-97. The United States Supreme Court has confirmed that this practice does not render a death sentence unconstitutional. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). See also, Ladner v. State, 584 So.2d 743, 763 (Miss. 1991).
This issue is without merit.

XVII. WHETHER THE COURT BELOW VIOLATED THE EIGHTH AMENDMENT BY FAILING TO INSURE THAT THE JURY UNDERSTOOD THAT IT WAS NOT PROHIBITED FROM CONSIDERING MITIGATING EVIDENCE BY THE GUILT PHASE "ANTI-SYMPATHY" INSTRUCTION?
Walker takes this issue and his argument directly from Ladner v. State, 584 So.2d 743 (Miss. 1991). Like Ladner, Walker asserts that the trial court's refusal to grant the following instruction, DP-8, was error:
The Court instructs the jury that although at the guilt and innocence phase of the trial, you were instructed that you were not to be swayed by sympathy, at this phase of the trial you are bound by law and your oath as jurors to consider mitigating factors. Mitigating factors are facts that, while they do not justify or excuse the crime, nevertheless in fairness, *613 sympathy, and mercy to ALAN DALE WALKER, must be considered by you as extenuating or reducing the degree of his blame or punishment. You may not, however, be swayed by prejudice or public opinion.
At the guilt phase of trial, the jury was instructed as part of Court's Instruction C-1, that in determining the facts from the evidence, and applying the law to those facts, it should "not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture."
Walker contends he was entitled to DP-8 to clarify for the jury that despite the giving of this "anti-sympathy" instruction at the guilt phase, they could apply a "reasoned moral, compassionate, and sympathetic response to mitigation" at the sentencing trial.
Walker fails to take into account the fact that our capital scheme provides for and utilizes a second, separate trial to determine the appropriate sentence for one adjudicated guilty of capital murder. The sentence may be determined by the same jury which determined guilt or another, convened solely to determine sentence. See Miss. Code Ann. § 99-19-101(1). Instructions to the jury at the guilt phase are not automatically applicable to the sentencing proceeding; separate instructions of the trial court, State and defense are submitted. Thus, the fact that the jury was instructed not to allow "bias, sympathy or prejudice" to affect their determination of guilt or innocence does not carry over as an instruction to be used during sentencing.
At sentencing, Walker requested and the jury was given Instruction DP-1, which stated:
The Court instructs the jury that you are not required to unanimously find that a mitigating circumstance exists before considering it. You are required to consider all mitigating circumstances. In considering the mitigating circumstances, each of you may decide for yourself what weight and consideration is to be given to mitigating circumstances.
(emphasis added).
Sentencing Instruction C-1-S provided the jury with examples of mitigating facts, defined as "those which tend to warrant the less severe penalty of life imprisonment... ."
Instruction DP-8 was correctly refused. This Court in Ladner stated that an instruction telling a jury that it must consider "sympathy and mercy" was cumulative to the court's instruction that the jury must consider mitigating circumstances if any aggravating circumstances were found. Id. at 760.
Finally, the Ladner Court stated:
During the sentencing phase, the jury was not instructed to disregard sympathy. There was no instruction specifically instructing the jury to regard sympathy either. In Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the United States Supreme Court held:
The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror.
Ladner v. State, 584 So.2d at 759-60, citing Saffle, 494 U.S. at 495, 110 S.Ct. at 1263-64. See also, Pinkney v. State, 538 So.2d 329, 351 (Miss. 1988); vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); Lockett v. State, 517 So.2d 1317, 1338 (Miss. 1987).
Walker notes Saffle was decided on habeas corpus review and declares this issue cannot be said to be final since the Supreme Court may yet grant review from a direct appeal. That possibility notwithstanding, this Court has steadfastly continued to hold that a defendant is not entitled to a mercy instruction. Foster v. State, 639 So.2d at 1301; citing Hansen v. State, 592 So.2d 114, 150 (Miss. 1991) cert. denied, March 20, 1995. This issue is without merit.

*614 XVIII. WHETHER THE NUMEROUS INSTANCES OF MISCONDUCT BY THE PROSECUTOR DEPRIVED ALAN WALKER OF A FAIR TRIAL?
Within this assignment, Walker contends that six specific instances of prosecutorial misconduct, when considered in toto, served to deprive him of a fair trial. It is again noted that Walker failed to offer specific, contemporaneous objections to several of the comments by the prosecutor he now asserts were improper. Accordingly, those instances of alleged misconduct were waived and these claims are procedurally barred. Foster v. State, 639 So.2d at 1270; Chase v. State, 645 So.2d at 835; Kelly v. State, 553 So.2d 517, 521 (Miss. 1989); Cole v. State, 525 So.2d at 369, cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Irving v. State, 498 So.2d 305 (Miss. 1986); cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983); cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).
This Court applies the procedural bar to all instances where Walker failed to object at trial. Without relaxing the procedural bar, this Court looks to the underlying merits of each of Walker's claims.

A. Comment on Walker's failure to testify.
The prosecutor's review of the evidence during his closing argument focused on Riser's testimony. Walker objected to the underlined language below:
But regardless of the level of his involvement, whether it's as little as he says or more, the man who was there with him shares equally in that crime. And according to all the evidence, beyond a reasonable doubt, ... It was not that Jason Riser was the one who did these deeds. Every bit of testimony says this was Alan Walker. Every bit of forensic evidence is consistent with the account out there at Crystal Lake.
Much was made of the fact that he had a ripped shirt on, a shirt that had been ripped, and why would one borrow such a shirt. Well, I didn't get the picture during this trial that Jason Riser had very many options when it came to clothes... . That doesn't create reasonable doubt. He told how the shirt got ripped, and that is the only testimony  the only reliable information beyond inference and guess and just trying to avoid our duty, that is your certain guide to the correct conclusion.

It requires a great stretch of the imagination to categorize this part of the prosecutor's argument as a comment on Walker's failure to testify. A reading of the full remarks, in context, makes it plain that the prosecutor was simply summarizing the account of the night's events as told by the State's chief witness, Jason Riser, and rebutting defense efforts to show that Riser was lying. There is simply no merit to Walker's argument concerning this issue.
At the closing argument of the sentencing proceeding, Walker complained of the underlined portion of the following statements:
For 11 months he's wanted to say something. He could have written a letter. He could have called them by phone. If all he had to say was what he said in those less than two minutes he stood here before you, I can see why he hasn't bothered until now, because I didn't hear anything that would change a single mind. You know, when you ask for mercy, first you have to be contrite. You have to repent first. If you saw a repentant man standing before you, you'd take the easy way out and you would give him life.
The prosecutor continued:
Let him think about it. Let him think about this terrible thing that he has done. Why it's already caused him to say something once in 11 months? Wouldn't that be a dark prison? He's not going to think about it. He evidenced that in the demeanor he had here before you.
The comments concerning the "11 months" referred to a statement made by Alan Walker to the jury prior to his counsel's closing *615 argument. Walker spoke to the jury, told them he was "not a mean person, a violent person," and said he was "scared to death." He stated that [t]he only really [sic] reason I've come up here to talk to you guys is because I've wanted to say something for 11 months now, and I haven't been able to say it. Walker proceeded to tell the jury he wanted to tell the victim's family, Riser's family and especially his own family that he was sorry "for what has happened."
Thus, the prosecutor's remarks were in direct response to Walker's attempt to show some degree of remorse. In Knox v. State, 502 So.2d 672 (Miss. 1987), the Court reviewed the following statement by the assistant district attorney in closing:
And that's the same individual who sat up here all day yesterday and put ... [the victim] through that kind of cross-examination and talked about that incident like he never knew a thing about it  like in his own mind he could remove himself from any guilt or remorse about that behavior.
Id. at 675.
Under unusual facts in Knox, the counsel's comments were the result of the defendant/appellant's active participation in his own trial. He extensively cross-examined the rape victim in particular detail, leading to the comments concerning his apparent lack of remorse. This Court cited the law as stated in Reed v. State, 197 So.2d 811, 815-16 (Miss. 1967), that normally, reference to the defendant's lack of remorse in the courtroom is prohibited to prevent the obvious implication leading therefrom that because of his lack of emotion, the accused must be guilty. Knox, 502 So.2d at 675. In Knox, however, this Court reasoned a different result must follow:

Reed is certainly the law in this state, particularly where the defendant has not taken the witness stand in his own behalf. Under the peculiar circumstances of this case, however, where the accused did not sit silent but personally subjected the victim to extensive cross-examination, his appearance and demeanor being very much a part of the information the jury received at trial, we cannot say that the argument in question was improper.

Id. (emphasis added).
In the instant case, while Walker did not attempt to represent himself, he spoke to the jury, effectively asked for mercy and stated he wished to express sorrow to all the families affected by the case. Thus, Walker's demeanor and appearance were factors the jury had to consider in sentencing him. The prosecutor was entitled to take issue with Walker's sincerity and argue that he did not deserve a sentence less than death on the basis of his apologetic plea to the jury. This Court has stated that "[a]lthough a jury may not be instructed to disregard, in toto, sympathy, a prosecutor may argue that a defendant is not deserving of sympathy." Pinkney, 538 So.2d at 351.
No objection was made by Walker to the comments now challenged. However, Walker correctly contends the failure to offer a contemporaneous objection does not necessarily bar consideration of a fundamental right. Livingston v. State, 525 So.2d 1300, 1306 (Miss. 1988). Even assuming for argument purposes such statements were improper, however, a cautionary instruction such as C-21, given in Walker's case, can remedy the error, if any. Derden v. State, 522 So.2d 752, 754 (Miss. 1988).
This issue is disposed of by our decision in Butler v. State, 608 So.2d 314 (Miss. 1992). The Court, discussing the permissible parameters of the district attorney's statements held:
It was competent for the district attorney to comment on the weight and worth of what was in evidence, but he also had the duty to carefully, very carefully refrain from making any remark which directly or by insinuation focused the jurors' attention or alerted them to the fact that Butler did not take the stand.
Id. at 318.
The statement expressing sorrow made by Walker at the close of the sentencing hearing, was left for the jury to consider in the nature of a factor in mitigation. Once before the jury, the prosecutor could permissibly assert this factor was not sufficient to overcome *616 the State's contention that Walker deserved no less than death. "Both sides are afforded wide latitude in their final arguments to the jury so long as they do not argue some impermissible factor." Minnick v. State, 551 So.2d 77, 93 (Miss. 1988) quoting Griffin v. State, 504 So.2d 186, 194 (Miss. 1987). See also Neal v. State, 451 So.2d 743, 762 (Miss. 1984).
No comment by the prosecutor on Walker's failure to testify is indicated. This issue is without merit.

B. Defense counsel's objection to the prosecutor's comments regarding stipulations was sustained.
Walker next complains of the following exchange during the State's closing argument at the guilt phase:
STATE: You know, throughout the trial you heard the stipulations being made. Did you notice that each one of those situations were made at a time when the State was prepared to go forward with its proof, proof that the defense would just as soon not be before you, and so a stipulation was made?
Walker fails to inform the Court that in response to his objection to this statement, the court admonished the prosecutor: "Don't raise a comment on why the stipulations were made. The stipulations were entered into. Proceed." Thus, for all practical purposes, Walker's objection was sustained. Walker made no request that the jury be instructed to disregard the prosecutor's comments.
In Foster v. State, 639 So.2d at 1282, the appellant argued that remarks by an accessory to the murder were prejudicial and constituted reversible error. This Court disagreed, stating:
Foster neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris' unresponsive remark was effectively cured when the trial judge sustained Foster's objection.
Id. (cites omitted).
The remarks by witness Harris in Foster's case, referring to other bad acts/crimes by Foster, arguably were more potentially prejudicial than those referring to the stipulations in the case at bar. Because the trial court admonished the prosecutor in response to Walker's objection, effectively sustaining the objection, and because Walker requested no further action, this assignment of error is rejected.

C. Improper vouching and expressing personal opinions.
Walker contends the prosecutor's comments on the testimony of Jason Riser served as a personal appeal to the jury to return a verdict which would vindicate the State's decision to plea bargain with Riser. In the portion of the argument to which Walker objects, the prosecutor remarked: "Jason's testimony gained some credibility with me. Jason Riser, accused by me, convicted in this court of murder, gained some credibility with me when he cried at the point that he did."
The record indicates that in closing arguments at the guilt/innocence proceeding, the prosecutor was explaining to the jury his decision to bargain with Riser to enable the State to use Riser's first person account of the offenses against Edwards. The record indicates a lack of objection to these comments for the reasons Walker now indicate that reversible error occurred. Livingston, 525 So.2d at 1303. This issue is procedurally barred and need not be considered.

D. Theatrical display of evidence calculated to inflame the jury.
Walker contends the display of the victim's ring on her grandmother's hand at trial was a calculated move by the State to inflame the jury. The record does not support this inference. During Tillie Edwards' testimony the following occurred:
Q. Do you recall any jewelry she may have had on?

*617 A. Yes, sir; she had this ring here on. (indicating)
Q. Okay. Now, when she would go out, was  what was the customary time she would get home?
Mr. Stegall: Judge, I'm going to object to that.
The Court: Overruled. Proceed.
The State much later during the proceedings requested a bench discussion. The jury was excused. The prosecutor informed the court he had requested a conference to determine "whether or not... Ms. Tillie Edwards is, in fact, wearing the ring that Edwards had on that night. Are you wearing that ring?" Edwards stated she was and the prosecutor informed the court that he was not aware that Edwards would wear the ring on the stand. The prosecutor was under the impression it was in the step-father's possession.
The prosecutor stated this issue should be resolved out of the presence of the jury, and requested Ms. Edwards to remove the ring and give it to someone who was not a witness. The defense responded "Judge, our thought was that that's why he put her up there in part." The defense objected, at this time, and moved for a mistrial. The court observed that Edwards was wearing the ring and raised "her hand somewhat." The court cautioned the State not to allow this type of occurrence again, and denied the defense motion for a mistrial.
In Young v. State, 352 So.2d 815 (Miss. 1977), this Court stated that:
A trial is not, and should not be, a display of theatrics or tactics of counsel or the accused. It is, and should be, a decorous, orderly and fair search for truth, to the end that justice is served. The judgment on maintaining these standards is best left, in the first instance, to the trial judge, who is present on the scene and best qualified to observe and understand the complexities of the whole trial.
Id. at 819.
In Woodward v. State, 533 So.2d 418 (Miss. 1988), in closing argument, the district attorney picked up the defendant's pistol and threw it in the air to demonstrate the defendant's action when arrested. Defense counsel argued the demonstration was "highly improper, prejudicial and had no place in a court of law." Id. at 432. The motion for mistrial was overruled and the district attorney was admonished accordingly. Counsel later picked up the pistol again and loaded the empty shell which had been discharged to kill the victim.
The Woodward Court found the district attorney's theatrical demonstration was "questionable," but held that the "occurrence here was properly handled by the trial court and constituted no reversible error." Id., citing Fuselier v. State, 468 So.2d 45, 53 (Miss. 1985) (the Court strives for a verdict based on reason and rules rather than emotion).
In the case sub judice, defense counsel made no objection when Ms. Edwards moved her hand indicating that the ring she had on was the same one her granddaughter was wearing at the time of her death. The issue was not otherwise brought to the jury's attention and the ring was removed before any further reference to it was made. It was the district attorney who brought the episode to the court's attention. The record indicates the entire situation was accidental, rather than a deliberate plan by the State as Walker's counsel suggests. Edwards later testified to finding the body and made reference to the ring, however, the ring was not on her hand as she testified to the position of the body. The assignment of error is rejected.

E. Misstatements of law.
The defense argues that the State implied the conviction of capital murder requires the imposition of the death penalty. Again, Walker failed to object and is procedurally barred. Chase v. State, 645 So.2d at 835; Foster v. State, 639 So.2d at 1289. Alternatively, without relaxing the bar, this Court looks at the underlying merits of Walker's claim. During closing argument the prosecutor submitted that the only "correct choice" upon conviction was the death penalty. The defense argues this is a misstatement of the law. The defense further challenges the prosecutor's statement that "those matters that are in mitigation... you *618 may consider if you find they exist... . I suggest to you [that] they have much less weight... ."
The sentencing instructions correctly instructed the jury. Instruction C-1-S informed the jury "must now decide whether the defendant should be sentenced to death or to life imprisonment." There was no question that the jurors were fully informed of their options. Jurors are presumed to follow the law as instructed. Brent v. State, 632 So.2d 936, 942 (Miss. 1994) citing McFee v. State, 511 So.2d 130, 136 (Miss. 1987), citing Arteigapiloto v. State, 496 So.2d 681, 685 (Miss. 1986); Cabello v. State, 490 So.2d 852, 857 (Miss. 1986); Sand v. State, 467 So.2d 907, 911 (Miss. 1985).
Instruction C-1-S also instructed the jury that it must consider any mitigating circumstances should any aggravating circumstances be found. The prosecutor's statements brought to the jury's attention examples of mitigating factors also listed in the instruction. His reference to a lower standard and his suggestion that mitigating factors carry "less weight," is supported by the law while aggravating factors must be found beyond a reasonable doubt, mitigating factors may simply be found.
The defense next complains that the prosecutor "utilized the absence of the [mercy] instruction to improperly argue that the jurors could not consider mercy or sympathy in their deliberations."
As noted in our discussion of Issue VII, the jury was instructed that it must consider any mitigating circumstances. Jurors are informed that the statements of counsel are not evidence, and that they must follow the instructions and consider the evidence presented. Accordingly, Walker's argument is not well taken. Finally, in Pinkney v. State, 538 So.2d 329, 351 (Miss. 1988), this Court stated that the "prosecution may argue that a defendant is not deserving of sympathy."
This issue is procedurally barred and alternatively is without merit. There is no basis for reversal.

F. Comment on appellate review.
Walker failed to object and is procedurally barred. Chase v. State, 645 So.2d at 835; Foster v. State, 639 So.2d at 1289. Alternatively, without relaxing the bar, this Court also examines the underlying merits of Walker's claim. Walker finds fault with the statements by the prosecutor which he maintains led the jury to believe that the Supreme Court, not the jury, "was responsible for determining the appropriateness" of the death penalty.
The prosecutor commented:
It's the law that our constitution  you've heard the constitution protects the accused in these proceedings, and it should; but that constitution also permits the death penalty in capital cases, and the State of Mississippi has required it. And it's been through the courts, through the appellate courts, and it has been honed and sharpened and brought into keen focus; and only in those few cases are we allowed to come up here and say we have met our burden."
The State argues the lack of merit and notes that this argument is procedurally barred. Indeed, Walker's only objection was to a different statement and therefore this Court need not consider this claim. Foster v. State, 639 So.2d at 1270. The State contends "the prosecutor merely argued that the death penalty has been determined to be an appropriate punishment, and the law guiding the implication of the death penalty has been developed over the years through the courts." We find that a plain reading shows no mention of appellate review of capital murder convictions and death sentences.
The defense cites Williams v. State, 544 So.2d 782, 802 (Miss. 1987), where Williams mentioned the appeals process that Jimmie Lee Gray went through before his death sentence was carried out. Williams is distinguishable from the case sub judice.
In Williams, the prosecutor specifically stated that Jimmy Lee Gray's case "took seven years to get the death penalty. Seven years. Every court in the land he went through. Fifty eight judges, they went through... . to make sure that every single *619 little right of the coddled criminal was taken care of." Id. at 799. The Williams prosecutor was referring to the defense counsel's discussion of Gray "to emphasize the jury's responsibility in capital sentencing... ." Id. at 797. The Williams Court considered Caldwell v. State, 443 So.2d 806 (Miss. 1983), in which the district attorney "argued to the jury that theirs was not the `final decision.'"
The facts in Caldwell and Williams, are entirely distinguishable from Walker's case. Here, the prosecutor merely stated that the constitution protects the accused, while it (meaning the constitution) "also permits death penalty in capital cases... ." The prosecutor's use of the word "it" obviously referred to the administration of the death penalty. He neither mentioned nor inferred that Walker's case would begin a long laborious journey through the appellate court system. In sum, the prosecutor was making an argument for implementing the death penalty. To argue, as the defense attempts to do, that the prosecutor tried to mislead the jury into believing that this Court "was responsible for determining the appropriateness of the death sentence it was being asked to impose," is misleading in and of itself. Further, the defense has misrepresented this Court's rulings in Williams and Caldwell.
This issue is procedurally barred for Walker's failure to object. Alternatively, and without relaxing the bar, we consider any merit to Walker's claim and we find none.

G. Conclusion.
Considering all of the alleged impermissible comments of the prosecutor, only one appears close, the vouching for Riser. As noted, other comments are barred and alternatively, meritless. In Minnick, the Court stated:
Taken as a whole, all of these statements fall into the permissible latitude afforded attorneys in closing argument. As this Court stated in Johnson v. State, 416 So.2d 383, 391 (Miss. 1982), quoting Nelms and Blum Company v. Fink, 159 Miss. 372, 382, 131 So. 817, 820 (1930):
Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.
Minnick, 551 So.2d at 93.
Walker argues that the "cumulative effect of the improper comments and other misconduct of the prosecution" deprived him of a fair trial. Walker is correct in citing Stringer v. State, 500 So.2d 928 (Miss. 1986), which notes that death penalty cases demand "heightened review" and thus "require that the cumulative impact of all the factors outlined above be reviewed... ." However, careful consideration of Walker's claims reveals no prosecutorial misconduct supporting reversal. There is no merit to Walker's assertion that he has been denied a fair trial.

XIX. WHETHER THE TRIAL COURT'S FAILURE TO COMPLETELY RECORD THE PROCEEDINGS WAS REVERSIBLE ERROR?
Walker contends his conviction and sentence must be reversed because the record of his trial was improperly preserved, making a complete review of the proceedings impossible on appeal. He cites fifty instances of unrecorded, off-the-record discussions.
The State responds that the record was complete in all relevant respects and included all those parts of a capital murder trial normally transcribed, such as voir dire of the jury, testimony of all witnesses, rulings of the court, and counsel's arguments. The State nonetheless reviews each unrecorded bench conference or discussion cited by Walker.
Walker cites cases wholly distinguishable from the situation here presented. For instance, Dobbs v. Zant, 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993), involved Dobbs' efforts to prove a claim of ineffective assistance of counsel. The transcript of closing arguments was unavailable. When Dobbs eventually located the transcript, the Court of Appeals refused his request to supplement *620 the record to include the transcript. The Supreme Court held that, "under the particular circumstances described above, the Court of Appeals erred by refusing to consider the sentencing hearing transcript." Id., at 359, 113 S.Ct. at 836. Likewise, in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Florida Supreme Court affirmed a death sentence without addressing the appellant's argument that the trial court should not have considered a presentencing report, including confidential portions, in overriding the jury's recommended sentence of life imprisonment. The High Court reversed, emphasizing "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." Id., at 361, 97 S.Ct. at 1206.
A review of the record reveals it is not inadequate and leaves nothing missing which is necessary to this Court's complete review of Walker's assignments on appeal. Nearly half of the alleged omissions occurred during voir dire and jury selection proceedings. The various discussions or bench conferences pertained to such matters as a lunch break, a juror's medical problem, a count of jurors remaining in the jury pool and the number of peremptory challenges remaining, and similar subjects. At the only point during which an objection was apparently discussed at the bench, the following appears:
MR. STEGALL: [W]hat I want to know next is the one that I think is important: Knowing everything about yourself as you do, would you be satisfied with yourself as a juror if you suddenly were to be seated in Alan Walker's chair over there? Would you be satisfied with yourself as a juror?
MR. SAUCIER: Your Honor, may we approach the bench on that, please, sir?
THE COURT: Come on up.
(Off-the-record discussion at the bench).
THE COURT: I sustain the objection.
Following this ruling, defense counsel continued his general questions to the jury. The bench conference on "that" undoubtedly referred to the question attorney Stegall posed to the jury, requesting they place themselves in the defendant's shoes. The record supports that the voir dire proceedings were transcribed and indicated on the record any bench discussions heard by only the court and counsel. Attorney Stegall, obviously aware that the court reporter was not present at such proceedings, neglected to request that any of these matters also be taken down.
In Winters v. State, 473 So.2d 452 (Miss. 1985), this Court was asked to consider whether the denial of a change of venue was error. Unfortunately, no record of the entire voir dire was made by the court reporter. Id. at 457. The Court stated, "Defense counsel offers no excuse for his failure to present a record of the voir dire examination of jurors other than that he (mistakenly) assumed that the proceedings were being taken down by the reporter when in fact they were not. This is insufficient excuse." Id. The Court devoted a brief discussion to the importance of having voir dire proceedings preserved and noted that the problem of an incomplete record appeared to have been eradicated, for the most part, in capital murder cases. Id. Despite efforts to include all court proceedings, voir dire of the jury was absent from the record the Court reviewed. However, comments of the court and motions were recorded and rejected as an assignment of error. The court reporter in Walker's case adequately performed her duty to record the proceedings, notwithstanding that not every word was taken down. The context of the off-the-record discussions fails to offer any basis for reversal.
The remaining omissions cited by Walker were largely during the guilt phase. Like those which occurred during juror selection proceedings, it is submitted none of these unrecorded discussions prejudiced Walker's ability to appeal his case. The discussions pertained to exhibits, to having the jury excused in order that a proffer could be made, and to matters between defense counsel and Walker. Again, the subject of the discussions is clear from it's context and not the basis upon which an incomplete record could be argued.
This Court has stated "it is the duty of the appellant to present a record of the trial *621 sufficient to show that the error of which he complains on appeal has occurred and, further, the error was timely and properly preserved." Doby v. State, 557 So.2d 533, 536 n. 2 (Miss. 1990).
This issue is without merit.

XX. WHETHER REPEATED EMOTIONAL OU URSTS BY STATE'S WITNESSES AND VICTIM'S FAMILY MEMBERS, AND DISRUPTIONS BY SPECTATORS DEPRIVED ALAN DALE WALKER OF A FUNDAMENTALLY FAIR TRIAL?
Walker complains of emotional outbursts during the proceedings. He failed to object to all but one of the complained of incidents, and is procedurally barred. Alternatively, without relaxing the bar, this Court addresses the underlying merits of Walker's claims.
Walker briefly argues that during the State's opening remarks there was "audible crying from a member of the victim's family." This is the only complained of incident where Walker voiced an objection at trial. An off-the-record bench discussion was held and the jury excused. Defense counsel informed the court that because of the family member sitting in close proximity to the jury, he would request a mistrial. The court refused to declare a mistrial, stating to defense counsel that the potential for this problem was one reason the court had asked counsel if the "the rule" should be invoked during opening statements. Counsel declined to invoke the rule at the court's request.
The court took note that Edwards' family members were sitting on the front row in the courtroom and made it clear that he would not permit family members or anyone else to allow their emotions to get out of control, to the point of tears being observed by the jury. Audience members were admonished that they would be excluded for the rest of the trial if order was not maintained. The audience agreed to follow the court's orders. The requested mistrial was properly denied. "[T]rial judges are peculiarly situated so as to decide (better and more logically than anyone else) when a trial should be discontinued." Davis v. State, 530 So.2d 694, 697 (Miss. 1988), citing Schwarzauer v. State, 339 So.2d 980, 982 (Miss. 1976).
Walker indicates that Tillie Edwards, the victim's grandmother and State's witness, became emotional when asked to identify photographs of Edwards. Trina Perry and Jason Riser also became "visibly upset" while testifying. Finally, Walker indicates that "coughing noises were heard coming from unidentified members of the audience" during the defense's closing argument. Walker implies that these noises were intended to belittle the defense's position. Walker argues that these events prejudiced the jury, to the point that Walker was deprived of a fundamentally fair trial under the Sixth, Eighth and Fourteenth Amendments to the United States and Mississippi Constitutions.
Walker failed to object to all but one of these situations at trial and is now procedurally barred.
With the remaining four "outbursts," there was no objection and no request for a mistrial. Nor was mention made of these "extremely prejudicial outbursts" in Walker's motion for a new trial. As an apparent excuse for his lack of further objections, Walker contends "after-the-fact admonitions or instructions would not have been curative, but in any event were not given. They could only have been remedied by the granting of a mistrial."
Walker completely disregards the settled rule in this state that a mistrial is reserved for those few instances where the court can take no action which would sufficiently cure improper occurrences inside (or outside) the courtroom. This Court has stated:
Elementary to all trial proceedings is the proposition that the occurrence of any prejudicially incompetent matter or misconduct before a jury, the damaging effect of which cannot be removed by admonition or instructions, necessitates a mistrial. However, it is the well established rule in Mississippi that where a trial judge sustains an objection to testimony interposed by the defense in a criminal case and instructs the jury to disregard it, the remedial acts of the court are usually deemed *622 sufficient to remove any prejudicial effect from the minds of the jurors. The jury is presumed to have followed the directions of the trial judge.

Davis v. State, 530 So.2d at 694, 697 (Miss. 1988) (citations omitted) (emphasis added). Utilizing the same reasoning in the context of displays of emotion by spectators and/or witnesses, Walker is left with no tenable basis upon which his failure to object or to request curative instructions can be based. Therefore, the incidents to which Walker refers this Court are barred from our consideration.
In Chase v. State, 645 So.2d at 848-49, Chase requested that the victim's family and friends be prevented from showing emotion in the courtroom as spectators. The motion was granted. Nonetheless, during the guilt phase the victim's widow took the stand and began crying as she described her husband's murder. Other family members in turn began crying. Defense counsel requested a mistrial based upon the earlier motion. The court overruled the motion, finding that no prejudicial effect was demonstrated.
On appeal, the Court emphasized that the "trial judge is in a better position to assess the effect of such an incident than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial." Id. at 848, quoting Ladner v. State, 584 So.2d 743, 753 (Miss. 1991).
The Chase court looked to Evans v. State, 422 So.2d 737 (Miss. 1982), where the victim's brother cried while on the witness stand giving testimony identifying the victim. In the case sub judice, Tillie Edwards was observing photos of Edwards to verify her discovery of the body. This took place during the guilt phase, where none of the photos were shown to the jury. The Court found "no reversible error in the jury hearing and seeing the family member's distress since `the appellant caused the situation and cannot complain, if the evidence has probative value.'" Chase, 645 So.2d at 848, quoting Evans, 422 So.2d at 743. The trial court in Chase opined that "[i]t seems rather unfair to kill a woman's husband and then complain because she cries." Id.
There was no abuse of discretion in denying the mistrial. The additional "outbursts" cited by Walker are challenged here for the first time and are thus subject to the procedural bar. In any event, the displays of emotion did not rise to a level of prejudice sufficient to deprive Walker of a fair trial.

XXI. NUMEROUS ERRORS WERE MADE DURING THE SELECTION OF THE JURY IN VIOLATION OF THE CONSTITUTION AND LAWS OF THE UNITED STATES AND THE STATE OF MISSISSIPPI.

A. The trial judge asked leading questions of the prospective jurors in violation of Alan Walker's right to a fair trial and impartial jury and impermissibly excused on its own motion jurors who were qualified and willing to serve.
Walker complains about the exclusion of three jurors under this sub-issue. We note initially that Walker used all twelve and the State used seven of its preemptory challenges. Walker failed to object to jurors Williams and Pickett and is procedurally barred. Juror Lyons was properly excused by the trial court and there is no merit concerning Walker's claim.

LISA WILLIAMS
Walker contends Williams was asked leading questions by the trial judge until she stated "she would be too concerned about her child to serve." Williams indicated she was a single mother responsible for her son's care after 5:00 pm every day when the babysitter left.
THE COURT: As a result of having your eight-year-old child, if you were selected to serve on this jury and you were going to be sequestered, meaning that you would be kept away from everyone during the course of this trial, ... would you be concerned about the welfare of your child during the day and the evenings as well? Would you have anybody to take care of him?
MS. WILLIAMS: Well, to tell you the truth, I did talk to a friend of mine... . *623 She said she could watch out for me, but like he's a mama's child.
THE COURT: In other words, you would be concerned about him 
MS. WILLIAMS: Yeah.
THE COURT: Would that concern cause you to somewhat be preoccupied worrying about him during the day and the evenings here and cause you some problems?
MS. WILLIAMS: Well, ... he's a big boy. He knows how to take care of himself, but I'm still his mother.
THE COURT: I understand. Would you prefer under the circumstances  not that you're trying to get out of jury duty, but would you prefer under these circumstances to ask to be relieved of this responsibility because of taking care of your child?
MS. WILLIAMS: Yes, sir. He does come first. I'm sorry.
The court thus excused Ms. Williams. It was within the court's discretion to do so. "Generally, a juror removed on a challenge for cause is one against whom a cause for challenge exists that would likely affect his competency ... at trial." Woodward v. State, 533 So.2d 418, 424 (Miss. 1988). Further, Walker fails to inform this Court that he expressly declined to offer any objection to the dismissal. ("Judge, for the record, the defendant has no objection to the Court excusing her.") As the claim is procedurally barred for failure to offer a contemporaneous objection, as well as lacking in merit, this claim fails. Cannaday v. State, 455 So.2d 713, 719 (Miss. 1984); Ratliff v. State, 313 So.2d 386 (Miss. 1975); Pittman v. State, 297 So.2d 888 (Miss. 1974).

ALBERTA LYONS
This potential juror was excused with the trial court commenting that her responses to voir dire indicated "that she would move from one side to the other of the [death penalty] issue, ... whether it be one way or another, that she would not be one that would independently follow her own perception of the evidence." The court also noted Lyons appeared concerned about leaving her two children alone at home all day.
During voir dire, Lyons constantly wavered on whether she would be able to follow the law at both phases of the trial. Depending on which counsel was questioning her, she intermittently could or could not. More importantly, Lyons made it unequivocally clear that she had asked to be dismissed and did not want to be involved in jury service, and only "guessed" she would "try" to listen to the evidence and be a fair juror to both sides if she were selected. This Court has stated it is not enough that a prospective juror would "try" to follow the court's instruction. Billiot v. State, 454 So.2d 445, 457 (Miss. 1984). For the same reasons, neither the State nor the defense is properly served by a juror who cannot confirm that she would pay attention while the evidence was presented and could not therefore fairly deliberate the issues. Nor is justice likely to be served to the State or defense by a juror who has made it clear that she does not want to serve.
There is no merit to Walker's claims concerning this juror.

ELLIS PICKETT
Pickett had a daughter who was raped while attending college. The perpetrator was never caught. Pickett stated he would try to lay aside this event and would judge Walker with an open mind, but noted "something could occur in my attitude ... that it might come out." However, Pickett told counsel he was not concerned about his emotions being affected by the case, he simply recognized the possibility it could happen. Finally, asked if he would feel better if he didn't have to serve on the jury because of the assault upon his daughter, Pickett answered: "I would say ... that is not a factor. What happened would not be a factor in how I feel about it." He harbored no ill will toward law enforcement persons because he didn't feel his daughter could have identified her attacker.
Neither Walker nor the State requested Pickett be excused for cause and he was not. Walker used his eleventh peremptory challenge to remove Pickett.
There was clearly no error in excusing venire persons Williams and Lyons for cause, since voir dire indicated they had concerns, *624 such as children, which would not permit them to pay attention to the evidence and serve fairly. As noted, the defense consented to the removal of Williams. Pickett, on the other hand, did not feel the issue of his daughter's attack would cloud his judgment in this case, harbored no ill will against law enforcement officers and stated he accepted the law on the death penalty and had "no trouble with that."
"As a general rule `the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.'" Nixon v. State, 533 So.2d 1078, 1085 (Miss. 1987), quoting 47 Am.Jur.Jury. § 121 (1969).
Neither the State nor Walker ever requested that Pickett be struck for cause. Walker is procedurally barred from raising an objection before this Court for the first time.

B. The trial court erroneously denied Alan Walker's challenges for cause to jurors McNamara, J. Thomas, Thompson and Tipton.
Walker lists four additional jurors he contends should have been removed for cause under the dictates of Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The Supreme Court there stated that "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." Id., 504 U.S. at 736, 112 S.Ct. at 2233. Such jurors are subject to be removed through use of the "complementary challenge for cause... ." Id., 504 U.S. at 733, 112 S.Ct. at 2232.

DON THOMPSON
Thompson, a Vicksburg police officer, stated during general voir dire of the venire his feeling that "due to the seriousness of the charge of capital murder, that if the defendant is found guilty of capital murder, that it should call for the death penalty." During individual questioning, Thompson first explained he knew something of the "gruesome" details of the crime, that the victim was beaten and burned, through a social conversation with a Harrison County deputy he met at a restaurant over a year before. However, Thompson stated he believed he could set aside anything he had learned and be impartial as a juror. He further informed the judge he knew nothing about the person accused of the crime, no names had been mentioned, and he knew of no other facts or evidentiary matters.
Questions from defense counsel about the extent of his information about the crime demonstrated that Thompson recalled only that the victim was beaten and the "perpetrators had attempted to cover up the crime scene by burning the body... ." Walker's counsel was apparently satisfied with this response as he requested to move to the next matter  whether Thompson would automatically vote for the death penalty. Thompson denied he would automatically return a death sentence following a capital murder conviction. He stated: "I believe my decision would be based on extenuating or mitigating circumstances. I believe I could be fair and impartial as far as determining if the death penalty was warranted based on the facts." Thompson could not state as a general matter that it would be more probable than not that he would vote for the death penalty. He felt he could base his decision on the evidence and the instructions.
In refusing to strike Thompson for cause, the trial court stated his notes "indicate with approval that he was a death qualified juror who should not be struck for cause."
The court correctly declined to excuse Thompson for cause, based on his responses during individual voir dire that he would not vote automatically for the death penalty. In addition, there is no automatic, "hard and fast rule that law enforcement officers or their relatives can be challenged for cause." Mhoon v. State, 464 So.2d 77, 81 (Miss. 1985), citing Odom v. State, 355 So.2d 1381 (Miss. 1978). We find no error to this claim by Walker.

EDDIE DON TIPTON
During initial voir dire, Tipton raised his hand and commented, regarding the death penalty, that "if the jury reached a decision of guilty, I would automatically *625 vote." Questioned individually, Tipton was asked if he could be neutral with regard to the death penalty. Tipton stated he "would like to think  and I would weight [sic] the evidence and then make my decision from there, that's presented in the second phase of the trial." Ultimately, Tipton stated that he could put aside any views and listen to the evidence and instructions. The court felt in individual questioning Tipton expressed the ability to "enter into the penalty phase neutral... ." This finding is supported. There is no error.

JAMES THOMAS
Thomas simply nodded his head to a question of whether jurors "would automatically vote for the death penalty." However, on individual voir dire, Thomas was asked whether he would be able to determine guilt "based entirely on the facts ... from the evidence and the law... ." He responded "yes, sir." As to sentencing, Thomas stated "I would have to give an answer to which one  whichever one [option] seemed most logical on the evidence." Further, he "believed in the death penalty for capital murder," but stated he could vote on a sentence of either death or life. He then stated he would have to vote with the majority of the other jurors as to the sentence. However, when it was explained that the vote was an individual choice, Thomas again stated he would "vote to whichever the evidence pointed to the most." He repeated he could be fair and impartial and follow the law. There is no error regarding this issue.

ALBERT MCNAMARA
McNamara first stated he would vote for the death penalty upon a capital conviction. Questioned individually, McNamara was asked, "are you saying that you would be predisposed to give a death sentence rather than a life sentence in most [capital] cases?" He responded, "... I would have to wait and see what other evidence come up before I could really make a decision on that." Further voir dire revealed McNamara's views on the death penalty:
MR. STEGALL: [I]f you have the choice of life and the choice of death in that second part, is it more likely just based upon the fact that you found him guilty of capital murder that you would vote for death?
MR. MCNAMARA: I would have to say yes.
MR. STEGALL: So you would be saying that you probably would be predisposed to vote death, all other things being equal?
MR. MCNAMARA: I would have to say yes.
* * * * * *
MR. CARANNA: You wouldn't ignore the instructions given to you by the Court and just automatically vote for death, would you?
MR. MCNAMARA: No, sir.
MR. CARANNA: You would review the facts and you would study the law that was given to you?
MR. MCNAMARA: Yes.
MR. CARANNA: And make a decision at that point in the sentencing phase?
MR. MCNAMARA: Right.
MR. CARANNA: And could that decision be death or life sentence?
MR. MCNAMARA: Yes, sir, depending on, you know, how the evidence come about in the second part of the trial.
The trial judge remarked that while he initially thought McNamara should be struck, he later determined "he had been rehabilitated in further questioning." Walker asserts the views of these four jurors demonstrated they could not be impartial in accordance with Morgan.
Morgan is the progeny of Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Concerning the latter decision, this Court has stated:
In that case the Court stated that it would continue to apply the rule of law announced in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). That rule, succinctly stated, is that `a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a *626 juror in accordance with his instructions and his oath.' The juror must be able to consider and decide the facts impartially and conscientiously apply the law.
Fuselier v. State, 468 So.2d 45, 53-54 (Miss. 1985) (citation omitted). This Court determined reversible error was demonstrated where several jurors were removed for cause whose voir dire responses did not indicate they could be impartial and follow the law as instructed. This Court concluded "[a]bsent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error." Id. at 55.
Both Tipton and Thomas were not subject to being struck for cause based on their death penalty response during individual voir dire. Although McNamara appears to present a somewhat closer question, he too ultimately responded that his decision on the sentence would depend on the evidence presented during the second phase of the trial. McNamara thereby demonstrated he understood the trial procedure, as explained, and of his own accord (rather than in response to a leading question) stated he could make a decision based on the proper considerations. We should not be surprised when lay persons, perhaps initially informed regarding death penalty issues, might respond inappropriately when asked leading questions during general voir dire. Yet, those same jurors, when fully informed of trial procedures and the requirement of considering the evidence and following the law, often rehabilitate themselves. Those who cannot are generally struck by the trial courts. It is indeed rare for a juror whose views show that he is unable to follow the instructions and his oath to escape such close scrutiny. Under such scrutiny in this case, the trial judge was satisfied with McNamara's overall responses, to the point that he changed his initial opinion and determined he should not be struck for cause. This Court agrees.
The voir dire of these prospective jurors did not clearly demonstrate that any one of them were unwaveringly committed to returning a sentence of death, as Walker suggests, and thereby were subject to removal for cause. When the jurors were questioned individually, each stated he could determine the proper sentence to impose based upon the evidence and the law. This Court has stated:
It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially. Burt v. State, 493 So.2d 1325, 1327 (Miss. 1986). This Court will not lightly interfere with a finding of fact made by a trial judge in a criminal case, and it will reverse only when it is satisfied that the trial court has erred in holding a juror competent, when this Court is clearly of the opinion that he was not a competent juror.
Woodward v. State, 533 So.2d at 418 (cites omitted).
This issue of Walker's is without merit.

C. Whether the trial court erroneously denied additional peremptory challenges to Alan Walker?
Continuing his previous argument that several jurors should have been excused for cause, Walker submits it was also error to deny him additional peremptory challenges for use in eliminating those same jurors. He cites Mhoon v. State, 464 So.2d 77 (Miss. 1985), in support.
That case is distinguishable, however, based on the seemingly unusually high number of law enforcement persons and their relatives present in the jury pool for Mhoon's trial. Walker argues in his case there were an unusual number of venirepersons who strongly favored the death penalty or were unable to say they could consider a sentence of life imprisonment. Walker offers no support for this bald assertion and this Court finds none in the record. Those persons whose views were, in fact, "unwavering", appear to have been removed.
Contrary to the facts in Mhoon, there was no indication of a "statistical aberration" in Walker's jury pool, thus no need for the judge to "ameliorate its effect" by granting additional peremptory challenges.
*627 In Carr v. State, 555 So.2d 59, 62 (Miss. 1989), this Court stated "[i]t is the duty of the court to ensure that a fair and impartial jury is empaneled." Id., citing King v. State, 421 So.2d 1009 (Miss. 1982), cert. denied, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). The trial court in Walker's case articulated his reasons, supported by the record, for each denial of a request to strike for cause. Accordingly, his denial of additional peremptory challenges to the defense did not serve to deny Walker of his right to a fair trial by an impartial jury. This issue does not indicate reversible error.

D. Whether the state impermissibly used its peremptory challenges to exclude black jurors in violation of Batson and Powers?

1. Whether the trial court should have required the state to give reasons for its peremptory strikes?
Early during peremptory challenges, the defense stated "Judge, on any black jurors that are excused on a peremptory challenge, we would ask them to state the Batson reasons for it." The trial court responded there had been no established pattern at that point and left it to the prosecutor to state his reasons for the strike, if he were so inclined.
The now familiar principle applies that a showing of purposeful discrimination must be made before the full Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) analysis is triggered. A defendant seeking to establish a Batson violation must demonstrate:
1. That he is a member of a "cognizable racial group";
2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and
3. That the facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.
Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987). Once the prima facie showing is made, the prosecutor must offer "`a clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Id., citing Batson, 476 U.S. at 98, n. 20, 106 S.Ct. at 1724, n. 20.
Under Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the teachings of Batson apply equally whether the accused and the prospective jurors stricken through peremptory challenges share the same race or not.
The record shows the defense requested the State's reasons for its strike after Lillian Rush was excused. As she was apparently the first minority juror excused, the trial court correctly found no prima facie case had yet been established.
The defense next requested the State's reasons for its strikes after the second black juror was struck, Pauline Lewis. The court made no finding but asked for the State's reasons. The State from this point on set forth its reasons for striking minority venirepersons. Accordingly, this entire sub-issue is unsupported and the argument that the judge should have required the State's reasons need not be further considered. We hold that the full Batson analysis was never triggered as no showing of a pattern of purposeful discrimination was ever demonstrated by Walker.

2. Whether the state impermissibly used its peremptory challenges to strike African Americans from the jury?
The State exercised its peremptory challenges against four black veniremen and three whites. The defense fails to adequately address the composition of the seated jury, as does the State. Court papers within the record reviewed by this Court lend no support.
Examining the basis for the four peremptory challenges against black venirepersons, however, the State offered the following explanations:

PAULINE LEWIS
Lewis had a teenage daughter and "the manner in which she responded to questions" led the prosecutor to feel "like she was dealing with some problem that we weren't able to reach." When the defense noted other accepted jurors also had children, the court stated "all of whom responded in a manner that allayed whatever concern the State had. The demeanor exhibited by Ms. *628 Lewis did not satisfy that." The trial court noted he had not yet found "any particular pattern" of discrimination from the manner of the State's challenges. "[T]he law is well settled that the trial judge is a fact-finder and that his finding will not be reversed unless manifestly wrong." Turner v. State, 573 So.2d 657, 664 (Miss. 1990).
Notwithstanding the lack of a prima facie showing of discrimination, this Court joined a variety of other jurisdictions in accepting demeanor as a legitimate, race-neutral basis for a peremptory challenge. Lockett v. State, 517 So.2d at 1352, and cases cited therein. There is no error here.

WILLIE ANN HARPER
The prosecutor stated his belief that Harper had been eliminated for cause on the previous day. Finding this was not the case, and because Harper was black, the defense requested a reason for the strike. The court interjected that no reason would be necessary given "all the questioning, the record will speak to that." The record indicates Harper stated she had a problem with possible sequestration due to the fact that she needed to be with her daughter and because she raised animals and had no one to care for them.
Walker's counsel questioned Harper further and learned the daughter was twenty-three years old with no apparent need to be supervised. Asked about the animals, Harper stated she had "30 hogs and about 30 or 40 chickens; mixed between there, ducks," and no one else to care for them. She cared for the animals on her own, in between working full-time for a doctor during the work day. Stegall declined to excuse her and the court would not excuse for cause. The court observed, however, that "there was substantial reason for striking that juror no matter what her race would be."
A full review of Harper's voir dire makes clear that she was validly subjected to the State's challenge. She stated her "fully [sic] attention" was taken by caring for her animals and garden, in addition to her full-time day job. While she stated she understood she could not go home at all if sequestered, she was "not saying that [she] would be able to stay here." She saw "no way possible" since no one could take over her responsibilities. Employment was expressly mentioned by the Batson court as one consideration upon which a challenge might be based. Id., 476 U.S. at 89 n. 12, 106 S.Ct. at 1718 n. 12. Employment and factors related thereto have also been accepted by various courts as race-neutral reasons for a peremptory challenge. See Lockett v. State, 517 So.2d at 1352, and Appendix I therein.

LILLIAN RUSH
The State adopted the reasons set forth in its position that she should be stricken for cause in support of its use of a peremptory challenge against her. It was stated: "This juror under questioning indicated repeatedly that she did not want to serve, and she felt as though sympathy would influence her and she would not reach a decision." Rush indicated she had four children ranging in ages from twenty-three to thirty-four years. She explained she would view the case as if she were the parent of the accused or the victim and would have trouble reaching any conclusion. She doubted she would "come to any definite conclusions," and felt sympathy might have a role in her decision.
The Lockett Court stated, "We, too, recognize that there are any number of reasons to strike a juror that are legitimate and race-neutral. We point these out today as illustrative examples, reiterating that `the prosecutor's explanation need not rise to the level of justifying exercise of a challenge for cause....'" 517 So.2d at 1352, and Appendix I.
Again we are confronted with a juror who did not want to serve and felt that sympathy would influence her even to the point of not being able to reach a decision. Jurors should not be forced to serve when they expressly state they do not want to. This is especially problematic where a juror also contemplates not being able to reach a verdict. The trial judge was not in error in allowing Rush to be peremptory. There is no merit to this claim.

LEWIS BURKE
Burke offered the following information of his own volition during voir dire:
MR. BURKE: I also want to bring out something else, too, that the DA probably *629 doesn't know and the Court doesn't. The defense know [sic] that I was  that I was on the board of directors of the Capital Defense Project... . I have served two years on the board of directors of that project. Again, the purpose of that project was to provide a backup center for defense attorneys in capital cases.
Burke also recalled reading about Walker's case in the Clarion-Ledger. The court accepted the reason of Burke's position as a member of the Board of the Capital Defense Project as sufficient to support the peremptory challenge.
Again, employment has been accepted as a valid basis for striking a juror and this situation, for obvious reasons, justifies the State's wish to remove him from the jury on a capital case.
It should be recalled that the State had five peremptory challenges remaining. Because no record is presented upon which the ultimate composition of the jury can be learned, it cannot be determined how many black persons served on the jury. Assuming some were seated, however, the State obviously did not use all its challenges in an effort to impermissibly eliminate all the minority venirepersons.
A complete review of the jury selection process during peremptory challenges indicates no prima facie case of purposeful discrimination was established by Walker. Accordingly, there was no need for the State to offer its required race-neutral reasons for exercising such challenges against 4 black venirepersons. That notwithstanding, the State did offer its reasons, which the court accepted. None of the four reasons appears suspect under prior holdings of this and other courts.
Therefore, Walker's Batson claim fails in all respects and this issue offers no basis for reversal.

E. Whether the trial court erred in granting certain of the State's challenges for cause in violation of Witherspoon-Witt standards?

MELINDA ZAPPIE
Zappie was struck for cause because she repeatedly answered counsel's question with the response that she would return a life sentence or at least "hope to." The court also questioned Zappie, trying to get a clear response on whether she would always vote for a life sentence when she had an option under the instructions. She stated "I would have to say yes, but I don't know how to say always." Questioned again by defense counsel whether she could base her decision on the evidence and the law, Zappie stated, "That gets back to  I would not vote for the death penalty today, but I don't know  I mean... ." She stated she would "hope to stand by my convictions," and hoped to "vote for life ... or choose that over the death penalty."
"On the authority of Stringer v. State, 500 So.2d 928 (Miss. 1986), the trial judge committed no error in excusing those jurors whose position on the death penalty was not unmistakably clear." Pinkney v. State, 538 So.2d 329, 344 (Miss. 1988). This Court has "upheld the dismissal of jurors who had given inconsistent answers with regard to their ability to return a death sentence." Id. at 345.
There was no error in removing Zappie for cause in view of her responses regarding the death penalty.

XXII. WHETHER THE CUMULATIVE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTIONS AND THE DEATH SENTENCE?
Finding no errors of a magnitude requiring reversal, this Court finds both the conviction of Walker of capital murder during the commission of sexual battery and the sentence of death are upheld.
There is no reversible error in either phase of the trial, thus there is no cumulative error. Foster v. State, 639 So.2d at 1303.
There never has been a perfect trial. As long as humans conduct and participate in trial of lawsuits, there will not be such a trial. *630 This Court has said many times that a defendant is not entitled to a perfect trial, only a fair trial. Sand v. State, 467 So.2d 907 (Miss. 1985); Bell v. State, 443 So.2d 16 (Miss. 1983); Palmer v. State, 427 So.2d 111 (Miss. 1983); Shaw v. State, 378 So.2d 631 (Miss. 1979); Stringer v. State, 500 So.2d 928 (Miss. 1986).
Walker received a fundamentally fair trial. We affirm both Walker's conviction and sentence of death.

PROPORTIONALITY REVIEW
In accordance with the mandate of Miss. Code Ann. § 99-19-105(3)(c), this Court "shall determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Where the sentence is found to be disproportionate, this Court may "set the sentence aside and remand the case for modification of the sentence to life imprisonment." § 99-19-105(5)(b). This Court has reviewed the record to compare Walker's case with other capital murder cases in which this Court has entered a final judgment as set forth in Appendix A. Considering the aggravating and mitigating circumstances presented herein, when weighed against those of other capital murder cases, we are of the opinion that the death penalty in Walker's case is neither disproportionate nor excessive.
The case of Woodward v. State, 533 So.2d 418 (Miss. 1988), provides sufficiently similar facts upon which a proper comparison of sentences may be made. Woodward was convicted of capital murder in the commission of rape, kidnapping and sexual battery. Like Walker, Woodward was convicted on all counts; he was sentenced to thirty years for kidnapping, thirty years for sexual battery, said sentences to run consecutively; and to death for the capital murder.
The facts showed that Woodward was a white male employed as a logging truck driver. While en route to the timber company where he worked, Woodward stopped his log truck across the middle of a highway, forcing twenty-four year old Rhonda Crane, his ultimate victim, to stop her car. Woodward forced Crane out of her vehicle and into his truck at gunpoint. He drove Crane into the woods to a desolate spot where she was forcibly raped and forced to perform oral sex. Woodward then murdered Rhonda Crane with a single bullet to the back of the head. Also similar to the case at bar, Woodward's victim was eventually located twenty-four hours after her death by a family member  her father, and a friend.
This Court considered the punishment imposed in Woodward's case, compared it to other death penalty cases and determined Woodward's death sentence was "proportionate to the penalty imposed in similar cases, considering the defendant and the sentence." Id. at 435. Woodward's sentence was therefore affirmed.
Factually, Walker's actions appear more egregious in nature, taking into account that his victim was severely beaten; suffered through forced sexual acts of fellatio and anal intercourse; was toyed with by being asked whether she wanted to live or die, after the plan to kill her was already formed; survived various unsuccessful attempts to kill her; and finally, was murdered and her body burned. Left behind was evidence of the humiliating sexual battery and a most gruesome scene for her family to discover and remember forever.
Aggravating factors in Walker's case were nearly identical to those presented in Woodward.
Finally, the Court must consider the fact that Jason Riser accepted a plea bargain and testified against Walker in exchange for a sentence of life imprisonment. See Culberson v. State, 379 So.2d 499, 510 (Miss. 1979). Because Walker failed to argue the issue of proportionality at all, it is assumed he would argue that the fact of Riser's life sentence would make his own death sentence disproportionate. This argument fails to take into account the testimony which showed it was Walker's idea to take the victim to Crystal Lake, that Walker was the perpetrator of the assaults upon her, other than Riser's admission of rape, and that Walker, alone, crushed *631 Edwards' neck and drowned her. Perry's testimony revealed Walker's admission to these offenses; when she asked him directly, face to face at the jail if had he had done it, Walker responded, "Yes." Walker also stated in a telephone conversation with Perry that "something just snapped." In view of the evidence, the prosecutor's characterization of Walker as the "leader," and Riser his "follower," was appropriate. No basis for finding Walker's sentence disproportionate is indicated.
This Court finds that a thorough consideration of Walker, his crime and the sentence imposed in this case, as compared to Woodward and all other death penalty cases, indicates the death penalty is proportionate. Walker's sentence of death in this case was not the result of passion, prejudice, or any other arbitrary factor. The jury's finding of the aggravating factors is amply supported by the record. Walker presented his mitigating evidence to the jury. The imposition of the death penalty by the jury will stand.

CONCLUSION
Walker's conviction of capital murder and sentence of death is supported by substantial evidence. After carefully reviewing each of Walker's assignments of error, this Court finds no basis for reversal. Walker's conviction and sentence of death are affirmed.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (SUPP. 1995) AND M.R.A.P. 41(a).
HAWKINS, C.J., PRATHER, P.J., SULLIVAN, PITTMAN, BANKS AND ROBERTS, JJ., CONCUR. LEE, P.J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Davis v. State, 660 So.2d 1228 (Miss. 1995).
Carr v. State, 655 So.2d 824 (Miss. 1995).
Mack v. State, 650 So.2d 1289 (Miss. 1994).
Chase v. State, 645 So.2d 829 (Miss. 1994).
Foster v. State, 639 So.2d 1263 (Miss. 1994).
Conner v. State, 632 So.2d 1239 (Miss. 1993).
Hansen v. State, 592 So.2d 114 (Miss. 1991).
* Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
* Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
*632 * Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).
* Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Giles v. State, 650 So.2d 846 (Miss. 1995).
Duplantis v. State, 644 So.2d 1235 (Miss. 1994).
Harrison v. State, 635 So.2d 894 (Miss. 1994).
Butler v. State, 608 So.2d 314 (Miss. 1992).
*633 Jenkins v. State, 607 So.2d 1171 (Miss. 1992).
Abram v. State, 606 So.2d 1015 (Miss. 1992).
Balfour v. State, 598 So.2d 731 (Miss. 1992).
Griffin v. State, 557 So.2d 542 (Miss. 1990).
Bevill v. State, 556 So.2d 699 (Miss. 1990).
West v. State, 553 So.2d 8 (Miss. 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
* Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
* Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
* Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
* Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 *634 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss. 1992).
Holland v. State, 587 So.2d 848 (Miss. 1991).
Willie v. State, 585 So.2d 660 (Miss. 1991).
Ladner v. State, 584 So.2d 743 (Miss. 1991).
Mackbee v. State, 575 So.2d 16 (Miss. 1990).
Berry v. State, 575 So.2d 1 (Miss. 1990).
Turner v. State, 573 So.2d 657 (Miss. 1990).
State v. Tokman, 564 So.2d 1339 (Miss. 1990).
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
* Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
McRAE, Justice, dissenting:
I agree with the majority that most of the issues raised by Walker on appeal are procedurally barred. However, the cumulative errors raised by Issues I, II, and XIII warrant reversal of Walker's conviction and a new trial. In particular, the evidence was not legally sufficient to support the underlying offense of sexual battery. Walker's case further was prejudiced by the circuit court's failure to grant his motion for a continuance and refusal to allow his attorney additional time for closing argument. The crimes with which Walker was charged and convicted are shocking beyond belief. That does not, however, negate his right to a fair trial. Accordingly, I dissent.
Miss. Code Ann. § 97-3-95 defines sexual battery as sexual penetration of "(a) Another person without his or her consent." Walker was indicted under the broad rubric of the sexual battery statute. However, the State's jury instruction S-12A limited the definition of sexual battery, for the purposes of Walker's trial, to mean only "the penetration of the vaginal opening of the body of Konya Rebecca Edwards by use of a limb or stick ... when Konya Rebecca Edwards was dead or alive." We have held, as the majority points out, that "a valid Section 97-3-19(2)(e) capital murder conviction must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony had either been charged alone." Fisher v. State, 481 So.2d 203, 212 (Miss. 1985) (emphasis added). The jury was presented with more than enough evidence to find Walker guilty of murder, or of rape and kidnapping, the separate charges for which he was indicted and convicted. Nevertheless, had Walker been charged solely with sexual battery, the evidence would not support his conviction. As the statute clearly states, consent is an element of the crime of sexual battery. There can be no consent from a dead person. The majority is quick to remind us that "[t]he fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge." West v. State, 553 So.2d 8, 13 (Miss. 1988). Were kidnapping or rape the underlying charge, I would *635 agree that these crimes were well in progress at the time of Edwards' death and thus not vitiated by the fact of her death prior to their consummation. However, by limiting the act of sexual battery to the penetration of Edwards' vagina with a tree limb or stick, we are looking at an act that the evidence indicates began and ended after she was dead. Therefore, as atrocious as it may be, we have evidence only of an act that amounts to the mutilation of a corpse, which, although considered by this Court when determining whether a crime was particularly heinous or atrocious, has not been categorized as a separate crime or even as an aggravating factor for sentencing purposes by our legislature. See e.g. Conner v. State, 632 So.2d 1239, 1270 (Miss. 1993); Jenkins v. State, 607 So.2d 1171, 1181 (Miss. 1992); Hansen v. State, 592 So.2d 114, 152 (Miss. 1991).
The circuit court's refusal to grant a motion for continuance is not grounds for reversal unless manifest injustice would result. Lambert v. State, 654 So.2d 17, 22 (Miss. 1995); Johnson v. State, 631 So.2d 185, 189 (Miss. 1994). See also Miss. Code Ann. § 99-15-29. Walker had a transcript of Riser's statement and a videotape for more than two months before the trial. However, in as much as Riser, who confessed to the kidnap, rape and murder of Konya Edwards and entered into a plea bargain two days before Walker's trial, received only a life sentence, it is apparent that Walker was prejudiced. His attorney had relied on the fact that Riser would not be a witness and with no notice, suddenly had only two days to prepare for the cross-examination of an eye-witness in what had been a case built upon circumstantial evidence.
The length of time allotted for closing arguments is within the discretion of the trial court. Conner v. State, 632 So.2d 1239, 1275-1276 (Miss. 1993); Willie v. State, 585 So.2d 660, 676 (Miss. 1991). Walker had requested and was granted one hour in which to present his closing arguments. He asked for five additional minutes, which was reasonable. He was granted only one minute to summarize his argument. Especially in capital murder cases, the allowance of a reasonable amount of additional time should be granted. Accordingly, I dissent.